1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

IN RE: PACIFIC MARKET
INTERNATIONAL, LLC, STANLEY
TUMBLER LITIGATION

This Document Relates to: All Actions

CASE NO. 2:24-cv-00191-TL

ORDER ON MOTION TO DISMISS

This is an action for damages and injunctive relief stemming from the use of lead in the manufacture of the Stanley-brand drinkware and the manufacturer's alleged failure to disclose the presence of lead in those products. This matter is before the Court on Defendant Pacific Market International, LLC's Motion to Dismiss. Dkt. No. 51. Having reviewed Plaintiffs' response (Dkt. No. 56), Defendant's reply (Dkt. No. 58), and the relevant record, and finding oral argument unnecessary, *see* LCR 7(b)(4), the Court GRANTS the motion with limited leave to amend.

I.    BACKGROUND

**A.    The Parties**

Plaintiffs are six residents of various states (Nevada, New York, California, and Washington) who purchased a "Stanley cup"[1] for personal, family, or household use at various times between 2021 and 2023. *See* Dkt. No. 48 ¶¶ 3–8. All Plaintiffs bought cups "to safely store and drink liquids without fear of exposure to toxins." *Id.* Most Plaintiffs bought them "on a reasonable assumption" that using the cup "could not expose" them to lead. *Id.* ¶¶ 3–6, 8. Two Plaintiffs *"*saw materials describing [the Stanley cups'] characteristics" before purchase. *Id.* ¶¶ 4, 6. All Plaintiffs would not have bought the cups had they know they contained lead. *Id.* ¶ 9. All Plaintiffs have stopped using the cups for fear of lead exposure. *Id.* Most Plaintiffs "would consider repurchasing the cups "if they were sold with a revised design that did not include using lead." *Id.* ¶ 10.

Defendant Pacific Market International, Inc. ("PMI") is a Washington limited liability company with its principal place of business in Seattle, Washington. *Id.* ¶ 11. Defendant advertises and sells its products throughout the United States directly to consumers and through intermediaries. *Id.*

**B.    Defendant's Marketing and Representations**

Defendant markets its Stanley cups as safe, practical drinkware. *Id.* ¶ 12. On the "Care and Use" insert packaged with its cups, Defendant warrants that its products, including the Stanley cups, are "free from any defect in workmanship or materials and to be thermally efficient provided used according to the instructions." *Id.* ¶ 15 (including photo of insert). Defendant

---

[1] In the Consolidated Class Action Complaint, Plaintiffs use "Stanley cups" to refer to "[Defendant]-made drinkware or related products that include lead as part of their design or manufacture." Dkt. No. 48 at 1 n.1. Accordingly, the Court will use the term to represent the same.

represents that it uses "recycled stainless steel" and advertised the cups as "BPA-free." *Id.* ¶ 16
(quoting The Quencher H2.0 Flowstate Tumbler | 40 Oz, Stanley 1913, https://www.stanley1913.com/
products/adventure-quencher-travel-tumbler-40-oz?variant=4456001001894 [https://perma.cc/V384-
33TX] (last accessed Dec. 26, 2024)); *see also id.* ¶ 15 (including photo of advertisement).
Defendant represents that its cups "are subject to tests ensuring that its products comply with
'strict guidelines, including but not limited to BPA/BPS, PFOS, and phthalate regulatory
requirements.'" *Id.* ¶ 17 (quoting *Do Stanley Products Contain Lead?*, Stanley 1913,
https://support.stanley1913.com/en/support/solutions/articles/69000850923-do-stanley-products-
contain-lead- [https://perma.cc/V4GK-BUU6] (last accessed Dec. 26, 2024)); *see also id.* ¶ 18
(including photo of statement). Such representations led consumers (including Plaintiffs) to
"reasonably but mistakenly believe that [Defendant] had disclosed all the materials that the
Stanley cups contained." *Id.* ¶ 19.

Defendant's marketing has also included paying social media influencers with large
followings to promote the Stanley cups, as well as a dedicated campaign to support its Adventure
Quencher Travel Tumbler, the success of which led to other Stanley cups with similar designs.
*See id.* ¶¶ 21–22. None of Defendant's social media marketing disclosed the presence of lead. *Id.*
¶ 21. Defendant also markets its products as "safe, fashionable choices for conscientious
consumers." *Id.* ¶ 42. It "routinely promotes images of families holding Stanley cups on its social
media pages and advertisements." *Id.* ¶ 44.

According to Defendant's public statements, its annual sales of Stanley products grew
from $70 million in previous years to over $750 million in 2023. *Id.* ¶ 23.

**C.    Use of Lead in Stanley Cups**

In late January 2024, Defendant's use of lead in the Stanley cups was made public
through news of third-party investigations. *Id.* ¶ 24; *see also id.* ¶ 37. Defendant "admitted to

using lead in the design and manufacturing of Stanley cups and that consumers could be exposed to the lead if a Stanley cup is damaged." *Id.* ¶ 24; *see also id.* ¶ 38. Specifically, at that time, Defendant offered the following explanation:

> **Do Stanley products contain lead?**
>
> At Stanley, one of the key features of our products is our vacuum insulation technology, which provides consumers with drinkware that keeps beverages at the ideal temperature. Our manufacturing process currently employs the use of an industry standard pellet to seal the vacuum insulation at the base of our products; the sealing material includes some lead. Once sealed, this area is covered with a durable stainless steel layer, making it inaccessible to consumers. Rest assured that no lead is present on the surface of any Stanley product that comes into contact with the consumer nor the contents of the product. In the rare occurrence the base cap of a product comes off due to ordinary use and exposes this seal, it is eligible for our Lifetime Warranty, available here:
> **https://www.stanley1913.com/pages/contact-warranty**

*Id.* ¶ 32 (boldface in original). Defendant continues to sell its Stanley cups without change to its manufacturing or marketing practices. *Id.* ¶¶ 24, 34, 50. Defendant has not contacted purchasers of the Stanley cups to inform them of the presence of lead. *Id.* ¶ 49. Defendant has also not offered refunds or other compensation. *Id.*

"Lead is a toxin that is unsafe in any amount and can cause lifelong harm." *Id.* ¶ 29. When touched, swallowed, or inhaled, it can cause "severe developmental problems in children that lead to lifelong adverse health effects." *Id.* It is also unsafe for adults and can cause adverse health effects for them as well. *See id.* "Several experts have said that [Defendant's] use of lead in Stanley cups is alarming and unnecessary." *Id.* ¶ 39. "One research director stated, '[I]f that bottom seal comes off, all bets are off. . . . Lead is so toxic you just can't take chances with it.'" *Id.* "A 'broken seal may not always be obvious,' and a child who fidgets with a broken cup faces 'a very possible and likely transference of microparticulate lead via normal hand-to-mouth behavior in young children.'" *Id.* Defendant claims that using lead to seal insulation is the

1    "industry standard," but other manufacturers use different processes that do not require using

2    lead or other toxins. *Id.* ¶ 40.

3    **D.     Procedural History**

4          This matter began as three proposed class actions. *See* Dkt. No. 1 (complaint in *Franzetti*

5    *v. Pac. Mkt. Int'l, LLC*, filed Feb. 12, 2024); *Krohn v. Pac. Mkt. Int'l, LLC*, No. C24-200, Dkt.

6    No. 1 (W.D. Wash. Feb. 14, 2024) (complaint); *Barbu v. Pac. Mkt. Int'l, LLC*, No. C24-258,

7    Dkt. No. 1 (W.D. Wash. Feb. 24, 2024) (complaint). On April 26, 2024, these cases were

8    consolidated. Dkt. No. 31. On May 16, a related case was also consolidated with these cases.

9    Dkt. No. 42; *see Brown v. Pac. Mkt. Int'l*, No. C24-635, Dkt. No. 1 (W.D. Wash. Mar. 4, 2024)

10   (notice of removal). The same day, interim class counsel was appointed. Dkt. No. 43.

11         On June 18, Plaintiffs filed the Consolidated Class Action Complaint ("CAC"). Dkt.

12   No. 48. Plaintiffs seek a permanent injunction requiring Defendant to disclose any lead and other

13   toxins at the point of sale, on packaging, and in advertisements; to perform a corrective

14   advertising campaign informing consumers that the cups contain lead; to warn consumers to stop

15   using the cups if they are damaged; and to stop using a cup design that includes lead. *Id.* ¶ 51.

16   Plaintiffs also seek compensatory and statutory damages refunding consumers for all amounts

17   paid for the Stanley cups, as well as punitive damages for Defendant's "deliberate concealment"

18   of its use of lead and that chance that a damaged cup could expose consumers to lead. *Id.*

19   Plaintiffs seek to represent a nationwide class as well as subclasses from Washington, Nevada,

20   New York, and California. *Id.* ¶ 52.

21         Defendant now brings the instant motion to dismiss the CAC. Dkt. No. 51; *see also* Dkt.

22   No. 58 (reply). Plaintiffs oppose. Dkt. No. 56. Defendant has also moved to strike Plaintiffs'

23   nationwide class allegations, which Plaintiffs oppose. Dkt. Nos. 52, 55, 59.

24

1

## II.    LEGAL STANDARD

2    A defendant may seek dismissal when a plaintiff fails to state a claim upon which relief

3    can be granted. Fed. R. Civ. P. 12(b)(6). In reviewing a Rule 12(b)(6) motion to dismiss, the

4    Court takes all well-pleaded factual allegations as true and considers whether the complaint

5    "state[s] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

6    (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While "[t]hreadbare

7    recitals of the elements of a cause of action, supported by mere conclusory statements," are

8    insufficient, a claim has "facial plausibility" when the party seeking relief "pleads factual content

9    that allows the court to draw the reasonable inference that the defendant is liable for the

10    misconduct alleged." *Iqbal*, 556 U.S. at 672. "When reviewing a dismissal pursuant to

11    Rule . . . 12(b)(6), 'we accept as true all facts alleged in the complaint and construe them in the

12    light most favorable to plaintiff[ ], the non-moving party.'" *DaVinci Aircraft, Inc. v. United*

13    *States*, 926 F.3d 1117, 1122 (9th Cir. 2019) (alteration in original) (quoting *Snyder & Assocs.*

14    *Acquisitions LLC v. United States*, 859 F.3d 1152, 1156–57 (9th Cir. 2017)).

15    A defendant may also seek dismissal when a plaintiff fails to plead "with particularity the

16    circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see Vess v. Ciba-Geigy Corp.*

17    *USA*, 317 F.3d 1097, 1107 (9th Cir. 2003) (deeming a motion to dismiss under Rule 9(b) "the

18    functional equivalent" of a motion to dismiss under Rule 12(b)(6) and thus treating dismissal

19    under both rules "in the same manner"). Under Rule 9(b), a plaintiff must normally plead "'the

20    who, what, when, where, and how' of the misconduct charged." *Kearns v. Ford Motor Co.*, 567

21    F.3d 1120, 1124 (9th Cir. 2009) (quoting *Vess*, 317 F.3d at 1106)). Where claims are grounded in

22    fraud, a plaintiff also must identify "what is false or misleading about the purportedly fraudulent

23    statement, and why it is false." *Davidson v. Sprout Foods, Inc.*, 106 F.4th 842, 852 (9th Cir.

24

2024) (quoting *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011)).

Finally, the Rule 9(b) standard "is relaxed in fraudulent omission cases." *Short v. Hyundai Motor Co.*, 444 F. Supp. 3d 1267, 1279 (W.D. Wash. 2020). "In such cases, a plaintiff 'will not be able to specify the time, place, and specific content of an omission as precisely as would a plaintiff in a false representation claim.'" *Id.* (quoting *Falk v Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1098–99 (N.D. Cal. 2007)). "Nonetheless, a plaintiff pleading fraudulent omission or concealment must still plead the claim with particularity." *Id.* (quoting *Ashgari v. Volkswagen Grp. of Am., Inc.*, 42 F. Supp. 3d 1306, 1325 (C.D. Cal. 2013)).

### III.    DISCUSSION

In the CAC, Plaintiffs allege 12 causes of action. *See* Dkt. No. 48 ¶¶ 63–184. As an initial matter, Plaintiffs have voluntarily dismissed without prejudice their fifth cause of action, brought under the Magnuson-Moss Warranty Act. *See* Dkt. No. 57. The Court will analyze the remaining claims.

### A.    Washington Consumer Protection Act ("WCPA")

Plaintiffs bring a claim under the WCPA. *See* Dkt. No. 48 ¶¶ 63–76 (First Cause of Action). To plead a claim under the WCPA, a plaintiff must allege "(1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation." *Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 37, 204 P.3d 885 (2009) (citing *Hangman Ridge Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 784, 719 P.2d 531 (1986)); *accord Greenberg v. Amazon.com, Inc.*, 3 Wn.3d 434, 453, 553 P.3d 626 (2024). "A plaintiff need not show the act in question was intended to deceive, only that it had the capacity to deceive a substantial portion of the public." *Young v. Toyota Motor Sales USA*, 196 Wn.2d 310, 318, 472 P.3d 990 (2020) (quoting *Panag*, 166 Wn.2d

at 47). "Deception exists if there is a representation, omission or practice that is likely to mislead a reasonable consumer." *Young*, 196 Wn.2d at 318 (quoting *Panag*, 166 Wn.2d at 50) (internal quotation marks omitted). "An accurate communication can still be deceptive." *Eng v. Specialized Loan Servicing*, 20 Wn. App. 2d 435, 446, 500 P.3d 171 (2021) (citing *Panag*, 166 Wn.2d at 50). Finally, whether an act is unfair or deceptive may be decided on a motion to dismiss. *See Greenberg*, 3 Wn.3d at 475 ("[T]he facts at the dismissal stage are not in dispute, which in turn permits an issue to be decided as a question of law.").

Defendant argues that the WCPA claim fails because Plaintiffs do not allege that the failure to disclose the presence of lead, and that the lead may be "exposed" if the cup is damaged, is material.[2] *See* Dkt. No. 51 at 20–23. Specifically, Defendant argues that "[w]ith no factual allegations showing that the lead *in Stanley cups* causes harm, there is no reason to believe that the alleged nondisclosure of lead would be clearly important to a reasonable person in deciding whether to buy a Stanley cup." *Id.* at 21 (emphasis in original). Defendant relatedly argues that the claim fails under Rule 9(b), because Plaintiffs' allegations of harm are not specific to Defendant's products. *See id.* at 22–23. In response, Plaintiffs argue that they

---

[2] Defendant's argument is premised on the idea that in WCPA omission cases, it is necessary for a plaintiff to allege materiality. See Dkt. No. 51 at 20 (citing *Lohr v. Nissan N. Am., Inc.*, No. C16-1023, 2022 WL 1449680, at *3 (W.D. Wash. May 9, 2022)). But in *Young*, the Washington Supreme Court squarely held that "materiality is not a necessary component of the first element" of a WCPA claim. 196 Wn.2d at 318. "While we have mentioned materiality in passing, generally noting that a deceptive framing *or omitted fact* was sufficiently material to establish the element," the court explained, "we have never found materiality was necessary as a matter of law." *Id.* (emphasis added). "We specifically reject that proposition now." *Id.*

Instead, Washington courts appear to hold that "a plaintiff alleges a deceptive act when their complaint claims the defendant knowingly failed 'to reveal something of material importance'"—in other words, that such allegations are *sufficient*, but not necessary. *Eng*, 20 Wn. App. 2d at 445 (quoting *Deegan v. Windermere Real Estate/Center-Isle, Inc.*, 197 Wn. App. 875, 885, 391 P.3d 582 (2017)) (internal quotation marks omitted); *see also Thorley v. Nowlin*, 29 Wn. App. 2d 610, 653, 542 P.3d 137 (2024) ("To sustain a CPA claim, we assume that the claimant must continue to show a representation of existing fact. Nevertheless, the fact need not be material to any transaction." (citing *Young*, 196 Wn.2d at 320)).

Plaintiffs do not dispute that materiality is required; they argue instead that they have sufficiently alleged it. *See* Dkt. No. 56 at 14–16. The Court will thus assess the claim as argued by the Parties.

sufficiently allege materiality because they would not have purchased the Stanley cups if

Defendant had disclosed the use of lead. *See* Dkt. No. 56 at 14–16. Notably, Plaintiffs assert that

"specific lead levels and physical harm are not at issue." *Id.* at 15. Plaintiffs also argue that Rule

9(b) does not apply, but that even if it does, the standard is satisfied. *See id.* at 16–17.

As an initial matter, the Court finds that Rule 9(b) applies to Plaintiffs' WCPA claim.

Rule 9(b) applies to WCPA claims when they allege a specific intent to deceive or a "'unified

fraudulent course of conduct.'" *REX – Real Est. Exch. Inc. v. Zillow Inc.*, No. C21-312, 2021

WL 3930694, at *8 (W.D. Wash. Sept. 2, 2021) (quoting *Vess*, 317 F.3d at 1105). On the other

hand, if "the core of plaintiff's complaint is that defendant's conduct has a 'tendency' or the

'capacity to deceive' consumers," then Rule 9(b) does not apply. *Id.* Here, as Defendant points

out (Dkt. No. 58 at 10–11), Plaintiffs allege that Defendant "deliberately concealed the use of

lead" (Dkt. No. 48 ¶ 41) and seek punitive damages for "deliberate concealment (*id.* ¶ 185).

Plaintiffs also allege, for example, that Defendant "systematically deceived consumers" by its

omission (*id.* ¶ 14), "kept customers in the dark" to avoid disrupting its successful sales (*id.*

¶ 25), and "misled the public" by its omission (*id.* ¶ 31). Thus, Plaintiffs plainly allege both a

specific intent to deceive and a unified fraudulent course of conduct such that Rule 9(b) applies

to their WCPA claim. *See Davidson*, 106 F.4th at 852–53 (applying Rule 9(b) to California

consumer protection claims that product labels "misled consumers into believing the products

provided health benefits to children under two when the products were in fact nutritionally and

developmentally harmful").

The Court finds that Plaintiffs have not sufficiently alleged a WCPA claim under Rule

9(b). In short, Plaintiffs have not sufficiently alleged that the omission was material, as they have

not shown sufficient harm from the specific amount of lead in the Stanley cups. *See Davidson*,

106 F.4th at 853 (where plaintiffs alleged economic harm, dismissing fraud-based claims under

Rule 9(b) because allegations of physical harm were "largely unspecific" to defendant's products, lacked context, or were speculative). Contrary to Plaintiffs' assertion, "specific lead levels and physical harm" *are* at issue—not because Plaintiffs allege physical harm (which they do not), and not because they need to allege actual consumption of or exposure to lead (which they do not), but because they allege that the use of lead was material due to the attendant risk of physical harm. *See, e.g.*, Dkt. No. 48 ¶¶ 3–10, 26, 30–31, 36, 45. Thus, without sufficient allegations to show that the lead in the Stanley cups could pose actual harm to consumers, "the apparent need for disclosure is a moot proposition." *Wilson v. ColourPop Cosmetics, LLC*, No. C22-5198, 2023 WL 6787986, at *5 (N.D. Cal. Sept. 7, 2023) (in context of Article III standing, further observing that "Plaintiff's claim for economic loss also necessarily relies on establishing the Products she purchased have been deemed unsafe" and "this 'loss of money' requires a showing that the Products are *actually* harmful" (emphasis in original)).

Plaintiffs' allegations about the harm posed by the lead in Stanley cups are mostly captured in two paragraphs in the CAC. In the first paragraph, Plaintiffs allege, "Lead is a toxin that is unsafe in any amount and can cause lifelong harm," and they make other general allegations about possible harms from lead exposure. Dkt. No. 48 ¶ 29. In the second paragraph, Plaintiffs supply quotes from "[s]everal experts" who opined in the press on the news of lead in Stanley cups. *Id.* ¶ 39; *see also id.* ¶¶ 24, 37.

But Plaintiffs' allegations are insufficient to establish materiality under the WCPA or particularity of harm under Rule 9(b). For example, the allegations about the possible effects of lead exposure (*id.* ¶ 29) are completely disconnected from the Stanley cups, unrelated to any specific amount of lead, or conclusory as to lead's universal effects. Further, the allegations regarding individuals who provided comments to the press (*id.* ¶¶ 24, 37, 39) are thin,

unsupported, and speculative. Upon a closer look,[3] they amount to much less than Plaintiffs make them out to be:

- One news story cited in Paragraphs 24 and 39 (originally posted on January 24, 2024, but updated later to include reference to this lawsuit) includes a quote from Jack Caravanos, doctor of public health and professor of environmental public health sciences at New York University's School of Global Public Health, who says, "[T]here really is practically zero risk of you ingesting any of the lead that's in this cup." Daryl Austin, *Do Stanley cups contain lead? What to know about the lawsuit and potential exposure risk*, TODAY (updated Feb. 22, 2024, 9:40 a.m. PST), https://www.today.com/health/news/stanley-cups-lead-rcna135513 [https://perma.cc/3SAP-WV3T] (last visited Jan. 14, 2025).

  The story also includes a statement from a spokesperson from the U.S. Centers for Disease Control and Prevention ("CDC"), which addresses the use of lead in manufacturing in general, not the presence of lead in Stanley cups.

- Another news story cited in Paragraphs 37 and 39 quotes Jane Houlihan, research director for Healthy Babies, Bright Futures, an alliance of nonprofits. *See* Madeline Holocombe & Sandy LaMotte, *Stanley and other drink cups contain lead. Should you be worried?* CNN (Jan. 26, 2024, 4:27 p.m. EST), https://www.cnn.com/2024/01/26/health/stanley-cups-lead-wellness/index.html [https://perma.cc/TUA2-EU6V] (last accessed Jan. 14, 2025). In the CAC, Plaintiffs quote Houlihan's remark that "if that bottom seal comes off, all bets are off . . . . Lead is so toxic you just can't take chances with it," but Houlihan also states that "[i]f the cup stays intact, there's likely no lead exposure risk for consumers."

---

[3] Although the Parties do not raise the issue, the Court notes that it may consider the articles, as they are incorporated by reference in the CAC. *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (holding incorporation by reference applies where "plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint"); *see also In re Amazon Serv. Fee Litig.*, 705 F. Supp. 3d 1255, 1261 n.1 (W.D. Wash. 2023) (incorporating online articles by reference). The articles, and the experts quoted therein, are critical to Plaintiffs' allegations of harm from lead. Moreover, Defendant cites two of Plaintiff's articles (Dkt. No. 51 at 15 n.4–5) and does not dispute the authenticity of any article.

The story also includes statements from the CDC and the U.S. Consumer Product and Safety Commission that address the general risks of lead exposure, not the presence of lead in Stanley cups.

- Another news story cited in Paragraph 39 includes quotes from multiple individuals. *See* Julia Ries, *Stanley Tumblers Contain Lead – And So Do Other Reusable Cups. Here's The Truth About Their Safety.*, HUFFPOST (Jan. 30, 2024, 1:23 p.m. EST), https://www.huffpost.com/entry/stanley-reusable-water-cup-lead_l_65b925abe4b01c5c3a383bfb [https://perma.cc/X3P3-WFRY] (last accessed Jan. 14, 2025).

Dr. Andrew Monte, a professor of emergency medicine and medical toxicology with the University of Colorado Anschutz Medical Center, says, "The risk of these cups is infinitesimally small." He goes on, "People do not have to be concerned about using these products, though if the cup is severely damaged and the lead is accessible, throw it out." The story continues: "According to Monte, the cup would have to be incredibly damaged for its lead plug to pop out of the drinking canister. 'This type of damage would have to be so severe that the canister wouldn't hold liquid anymore, so this doesn't represent a realistic possibility,' Monte said."

The story reports that Prof. Caravanos "personally tested a few Stanley tumbler with an X-ray fluorescence instrument that can detect various metals, and didn't find any lead. This suggests that the metal is buried deep within the cup, he said." Later, the story reports that "according to Caravanos, you probably don't need to toss out your reusable tumbler. 'It's a manageable risk,' he said, adding that the cups don't present a serious public health threat.'"

In the CAC, Plaintiffs quote Dr. Maryann Amirshahi, a co-medical director of the National Capital Poison Center, stating that a "broken seal may not always be obvious." But Dr. Amirshahi's comment addresses products in general that contain lead, not the Stanley cups in particular.

The story also includes general comments about the dangers of lead that are not specific to the Stanley cups or Defendant.

Without additional factual support that demonstrates a specific and plausible risk of harm from the lead in Stanley cups, the mere presence of lead could not be material to a reasonable consumer. *See Balistreri v. McCormick & Co.*, No. C22-349, 2023 WL 5988600, at *11 (N.D. Cal. Sept. 13, 2023) (in analyzing California claim under implied warranty of merchantability, finding "Plaintiffs' assertion that any product containing Heavy Metals is unsafe for human consumption to be a conclusory statement unsupported by facts alleged in the Complaint"). As Defendants argue (*see* Dkt. No. 51 at 22), allowing these allegations to survive a motion to dismiss would green-light all kinds of lawsuits based merely on the presence of a material that, *in some unspecified amount*, could be harmful. *Cf. Weaver v. Champion Petfoods USA Inc.*, No. 18-1996, 2019 WL 2774139, at *3 (E.D. Wis. July 1, 2019) (in analyzing claim under Wisconsin Deceptive Trade Practices Act, finding "the mere presence of heavy metals" insufficient to support claim of fraudulent representation). However, Plaintiffs may be able to cure these deficiencies with amendment.

Therefore, as to the First Cause of Action (WCPA), Defendant's motion is GRANTED with leave to amend.

## B.    Washington Product Liability Act ("WPLA")

Plaintiffs bring a claim under the WPLA for a design defect. *See* Dkt. No. 48 ¶¶ 77–88 (Second Cause of Action). "[T]he WPLA creates a single cause of action for product-related harms that supplants previously existing common law remedies." *Wash. Water Power Co. v. Graybar Elec. Co.*, 112 Wn.2d 847, 860, 774 P.2d 1199 (1989). A plaintiff may sue under the WPLA for "any claim or action brought for harm caused by the manufacture, production, making, construction, fabrication, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging, storage or labeling of the relevant product." RCW 7.72.010(4). A product manufacturer is liable under the WPLA if, among other things,

1    "the product was not reasonably safe as designed." RCW 7.72.030(1). "A product is not

2    reasonably safe as designed, if, at the time of manufacture, the likelihood that the product would

3    cause the claimant's harm or similar harms, and the seriousness of those harms, outweighed the

4    burden on the manufacturer to design a product that would have prevented those harms and the

5    adverse effect that an alternative design that was practical and feasible would have on the

6    usefulness of the product." RCW 7.72.030(1)(a).

7         However, "harm" does not include "direct or consequential economic loss." RCW

8    7.72.010(6). "The WPLA confines recovery to physical harm of persons and property and leaves

9    economic loss, standing alone, to the Uniform Commercial Code." *Touchet Valley Grain*

10   *Growers, Inc. v. Opp & Seibold Gen. Const., Inc.*, 119 Wn.2d 334, 351, 831 P.2d 724 (1992).

11   "The economic loss exclusion 'marks the boundary between the law of contracts—designed to

12   enforce expectations created by agreement—and the law of torts—designed to protect citizens

13   and their property by imposing a duty of reasonable care on others.'" *King County v. Viracon,*

14   *Inc.*, No. C19-508, 2019 WL 12043501, at *3 (W.D. Wash. Dec. 4, 2019) (quoting *Hofstee v.*

15   *Dow*, 109 Wn. App. 537, 543, 36 P.3d 1073 (2001)). "Particular damages may be remediable in

16   tort as well as in contract, but if the damages fall on the contract side of the line and more properly

17   remediable in contract, tort recovery is precluded." *Id.* (quoting *Hofstee*, 109 Wn. App. at 543).

18        Defendant argues that the WPLA claim fails for the same reason that the WCPA claim

19   fails: Plaintiffs do not sufficiently allege that the Stanley cups were "not reasonably safe for their

20   intended use." Dkt. No. 51 at 23. Defendant also argues that the claim fails for the independent

21   reason that the WPLA excludes pure economic loss, and Plaintiffs only allege economic loss. *See*

22   *id.* at 24. In response, Plaintiffs argue that they clearly allege the cups pose a safety risk (*see* Dkt.

23   No. 56 at 17), and that the WPLA can encompass economic damages of the kind they allege (*see*

24   *id.* at 17–18).

As an initial matter, the Court finds that Plaintiffs have not sufficiently alleged a WPLA claim because as discussed above, *see supra* Section III.A, Plaintiffs do not sufficiently allege physical harm from the lead in the Stanley cups. Indeed, Defendant's argument is perhaps even stronger under the WPLA, which explicitly weighs harm to claimants against the burden on the manufacturer and usefulness of the product. *See* RCW 7.72.030(1)(a). However, Plaintiffs may be able to cure these deficiencies with amendment.

Further, Plaintiffs are correct that the WPLA *may* encompass certain kinds of facially "economic" damages. The Washington Supreme Court has explained that "a 'risk of harm' analysis is the appropriate test for determining the nature of damages," rejecting a bright-line approach. *Touchet Valley*, 119 Wn.2d at 351 (citing *Graybar*, 112 Wn.2d 847). The court identified two tests used by Washington courts to analyze the risk of harm: the "sudden and dangerous test" and the "evaluative approach." *Id.* at 351–52. But the court explicitly left open "which approach to characterizing the risk of harm is preferable in this State." *Id.* at 352.

Since Plaintiffs claim to satisfy the evaluative approach (*see* Dkt. No. 56 at 18) and Defendant does not argue for the application of any particular test, the Court will "focus its analysis" on Plaintiffs' test. *Viracon*, 2019 WL 12043501, at *3. The evaluative approach "proceeds on the theory that a product user should not have to suffer a calamitous event before earning his remedy in tort." *Touchet Valley*, 119 Wn.2d at 351 (citing *Graybar*, 112 Wn.2d 866). Under this test, a court considers three factors in analyzing the risk of harm: "(1) the nature of the defect; (2) the type of risk; and (3) the manner in which the injury arose." *Id.* at 353. In other words, a court examines "whether the defect was merely a failure to meet the expectations under the contract or indicative of a hazardous product requiring the protection of tort law"; "whether the risk was significant and whether it was foreseeable"; and "whether the injury arose as the result of a calamitous and sudden event." *Hofstee*, 109 Wn. App. at 545; *see also Staton*

1    *Hills Winery Co., Ltd. v. Collons*, 96 Wn. App. 590, 598–99, 980 P.3d 784 (1999) (applying the

2    test); *Nobl Park, LLC of Vancouver v. Shell Oil Co.*, 122 Wn. App. 838, 849, 95 P.3d 1265

3    (2004) (same).

4        The Court finds that Plaintiffs' WPLA claim also fails as alleged because it fails the

5    evaluative approach test and, therefore, is barred by the WPLA exclusion for economic loss. As

6    explained above, Plaintiffs do not make sufficient allegations to show the Stanley cups are

7    hazardous products requiring the protection of tort law or that the risk of harm is significant.

8    Moreover, Plaintiffs do not currently allege that the harm is calamitous and sudden; indeed, the

9    allegation that lead is exposed only after ordinary use suggests that the harm arises gradually, the

10   opposite of a sudden event. *See Viracon*, 2019 WL 12043501, at *4. However, Plaintiffs may be

11   able to cure these deficiencies with amendment as well.

12       Therefore, as to the Second Cause of Action (WPLA), Defendant's motion is GRANTED

13   with leave to amend.

14   **C.    Breach of Express Warranty**

15       Plaintiffs bring a claim for breach of express warranty under Washington law. *See* Dkt.

16   No. 48 ¶¶ 89–98 (Third Cause of Action). "RCW 62A.2–313 defines express warranties as

17   (1) '[a]ny affirmation of fact or promise', (2) '[a]ny description' or (3) '[a]ny sample or model'

18   by a seller relating to or describing the goods, when such representation forms the 'basis of the

19   bargain'." *Touchet Valley*, 119 Wn.2d at 348 (quoting RCW 62A.2–313(1)(a)–(c)). Where a

20   manufacturer makes express representations, a plaintiff is not required to show reliance on the

21   representations, but "he or she must at least be aware of such representations to recover for their

22   breach." *Baugh v. Honda Motor Co., Ltd.*, 107 Wn.2d 127, 152, 727 P.2d 655 (1986). "[U]pon

23   proof of the affirmation of fact or promise and the buyer's purchase of the goods, it is then

24   ***presumed*** that the buyer purchased the goods at least partially as a result of the affirmation or

promise, ***leaving it to the seller to show that this was not the case***." *Poole v. Benjamin Moore & Co., Inc.*, No. C18-5168, 2018 WL 2716806, at *2 (W.D. Wash. June 6, 2018) (quoting 18 Williston on Contracts § 52:49 (4th ed.)) (boldface and emphases in original).

Defendants argue that there are no allegations that Plaintiffs were aware of any express warranty (*see* Dkt. No. 51 at 24); no allegations that the Stanley cups were not "safe and durable" (*see id.* at 25); no allegations that Defendant made the alleged warranty (*see id.*); and, to the extent that the claim relies on the warranty that the cups are "free from any defect in workmanship or materials," the allegations are insufficient to show a breach (*see id.* at 25–26). In response, Plaintiffs argue that they allege awareness of a warranty (*see* Dkt. No. 56 at 19) and the existence of a warranty (*see id.*), and that they sufficiently allege breach of a "safe and durable" warranty (*see id.* at 20).

The Court finds that Plaintiffs have not sufficiently alleged a breach of express warranty. First, Plaintiffs do not allege awareness of *any* specific representations, let alone representations that amount to express warranties. At best, two Plaintiffs "saw materials describing . . . characteristics" of the Stanley cups (Dkt. No. 48 ¶¶ 4, 6), but Plaintiffs do not identify what these materials are or what representations they contained.

Second, Plaintiffs have not alleged breach of an express warranty. Plaintiffs argue in their response that Defendant "warranted to consumers that the Stanley cups were safe and durable" (Dkt. No. 56 at 20 (citing Dkt. No. 48 ¶ 25)), but this allegation appears to be simply a characterization of Defendant's marketing; Plaintiffs do not allege that Defendant ever made this specific representation. Plaintiffs *do* allege that Defendants expressly represented that the cups are "free from any defect in workmanship or materials" (Dkt. No. 48 ¶ 15), but Plaintiffs do not allege that the Stanley cups bore any defect in workmanship or materials. Such language is understood by courts to warrant against *manufacturing* defects, not design defects as Plaintiffs

1   allege here. *See Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1224 (9th Cir. 2015) (applying

2   California Commercial Code § 2313, which contains language identical to RCW 62A.2–313, and

3   distinguishing an ambiguous express warranty from "materials and workmanship" warranty that

4   covers only manufacturing defects).

5       Therefore, as to the Third Cause of Action (breach of express warranty), Defendant's

6   motion is G&#8203;RANTED with leave to amend.

7   **D.    Breach of Implied Warranty of Merchantability**

8       Plaintiffs bring a claim for breach of the implied warranty of merchantability. *See* Dkt.

9   No. 48 ¶¶ 99–108 (Fourth Cause of Action).

10      "Unless excluded or modified, a warranty that goods are merchantable 'is implied in a

11  contract for their sale,' so long as the seller is a 'merchant with respect to goods of that kind.'"

12  *Tex Enters., Inc. v. Brockway Standard, Inc.*, 149 Wn.2d 204, 208, 66 P.3d 625 (2003) (quoting

13  RCW 62A.2–314(1)). "This implied warranty of merchantability assures that the goods 'are fit

14  for the ordinary purposes for which such goods are used.'" *Id.* (quoting RCW 62A.2–314(2)(c)).

15  Moreover, "lack of privity has historically been a defense to claims of breach of warranty." *Id.* at

16  209. However, "where a commercial plaintiff can show that it is the intended third-party

17  beneficiary of a contract between the manufacturer and its direct purchaser, recovery may be

18  available under a third-party beneficiary analysis." *Id.* at 213–14 (citing *Touchet Valley*, 119

19  Wn.2d at 345–47). Washington courts "apply the 'sum of the interaction' test essentially to

20  determine whether the manufacturer was sufficiently involved in the transaction (including post-

21  sale) with the remote purchaser to warrant enforcement of an implied warranty." *Babb v. Regal

22  Marine Indus., Inc.*, 186 Wn. App. 1003, 2015 WL 786857, at *3 (2015). "Plaintiffs can

23  demonstrate they are third-party beneficiaries where a manufacturer knew a purchaser's identity,

24  knew the purchaser's purpose for purchasing the manufacturer's product, knew a purchaser's

requirements for the product, delivered the product, and/or attempted repairs of the product in question." *Lohr v. Nissan N. Am., Inc.*, No. C16-1023, 2017 WL 1037555, at *7 (W.D. Wash. Mar. 17, 2017).

Defendant argues that Plaintiffs fail to allege privity of contract between them and Defendant (*see* Dkt. No. 51 at 26–27) and fail to allege that the Stanley cups are not fit for ordinary use or that they do not conform to Defendant's representations and warranties (*see id.* at 27–28). In response, Plaintiffs argue only that consumers were indeed the intended third-party beneficiaries. *See* Dkt. No. 56 at 20–21. Plaintiffs do not respond to Defendant's argument about fitness for ordinary use, which the Court may consider as an admission that the argument has merit. *See* LCR 7(b)(2).

The Court finds that Plaintiffs have not sufficiently alleged a breach of the implied warranty of merchantability because they do not (and cannot) allege privity with Defendant. *See Baughn v. Honda Motor Co., Ltd.*, 107 Wn.2d 127, 151, 727 P.2d 655 (1986) (barring implied warranty action where plaintiff "sued the manufacturer rather than the dealer who sold him the mini-bike"). Regarding the "sum of the interaction," Plaintiffs' allegations amount simply to allegations about Defendant's marketing or purported express warranties; there are no allegations that Defendant knew Plaintiffs' identity, purpose, or requirements, let alone that Defendant itself delivered the product or attempted repairs. *See Lohr*, 2017 WL 1037555, at *7. This lack of allegations contrasts with the allegations in cases where courts have found the plaintiffs were third-party beneficiaries. *See, e.g.*, *Touchet Valley*, 119 Wn.2d at 346–47 (finding that manufacturer knew plaintiff's identity, its purpose, and its requirements for grain storage building; designed building knowing specifications were plaintiff's; delivered components for construction; and joined in attempted repairs). Ultimately, Plaintiffs supply no authority to support the proposition that a manufacturer's general marketing to consumers is sufficient to

establish contractual privity between a manufacturer and specific end-purchasers for the purpose of the implied warranty.

Therefore, as to the Fourth Cause of Action (breach of implied warranty of merchantability), Defendant's motion is GRANTED without leave to amend, as amendment would be futile.

**E.     California Unfair Competition Law ("UCL")**

Plaintiffs Krohn, Brown, and Robinson bring a claim under all three prongs of the California UCL on behalf of themselves and the putative California subclass. *See* Dkt. No. 48 ¶¶ 119–126 (Sixth Cause of Action).

"The UCL prohibits, and provides civil remedies for, unfair competition, which it defines as 'any unlawful, unfair or fraudulent business act or practice.'" *Kwikset Corp. v. Superior Ct.*, 246 P.3d 877, 883 (Cal. 2011) (quoting Cal. Bus. & Prof. Code § 17200). Private suits under the UCL are "limited to any 'person who has suffered injury in fact and has lost money or property' as a result of unfair competition." *Id.* at 884 (quoting Cal. Bus. & Prof. Code § 17204).

Defendant argues that Plaintiffs do not sufficiently allege a UCL claim for deceptive statements (*see* Dkt. No. 51 at 29–30) or omissions (*see id.* at 30–33). In response, Plaintiffs argue that they have sufficiently alleged claims under all three prongs of the UCL. *See* Dkt. No. 56 at 21–24. The Court reviews each prong in turn.

**1.      "Unlawful"**

"A [UCL] action 'to redress an unlawful business practice "borrows" violations of other laws and treats [them] . . . as unlawful practices independently actionable.'" *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1214 (9th Cir. 2020) (quoting *Farmers Ins. Exch. v. Superior Ct.*, 826 P.2d 730, 734 (Cal. 1992)). "'Unlawful' practices under the UCL encompass 'any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory,

regulatory, or court-made.'" *Battle v. Taylor James, LLC*, 607 F. Supp. 3d 1025, 1044 (C.D. Cal. 2022) (quoting *S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 85 Cal. Rptr. 2d 301, 311 (Cal. Ct. App. 1999)).

For the basis of this theory, Plaintiffs mostly point to their other claims in this matter, including breaches of express and implied warranties (Dkt. No. 48 ¶¶ 89–108) and violations of the WCPA (*id.* ¶¶ 63–76), WPLA (*id.* ¶¶ 77–88), and California Consumer Legal Remedies Act ("CLRA") (*id.* ¶¶ 127–136). *See* Dkt. No. 56 at 22. Thus, Plaintiffs' theory mostly rises and falls with other claims.

Plaintiffs also allege that Defendant violated the California False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500–17509 (*id.* ¶¶ 121, 124), though they do not bring an independent claim under that statute. The FAL makes it unlawful to make "any statement" concerning real or personal property or services "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

For the reasons stated above, the Court finds that Plaintiffs have not sufficiently alleged a UCL claim under the "unlawful" prong that is grounded in other claims in the CAC. *See supra* Sections III.A–D. Further, Plaintiffs have not sufficiently stated a claim grounded in the FAL because they not alleged awareness of any specific statements prior to purchase. However, these deficiencies may be cured by amendment.

### 2.    "Unfair"

The Ninth Circuit has explained how to evaluate "unfair" practices under the UCL:

> [C]ourts consider either: (1) whether the challenged conduct is tethered to any underlying constitutional, statutory or regulatory provision, or that it threatens an incipient violation of an antitrust law, or violates the policy or spirit of an antitrust law [the "tethering" test]; (2) whether the practice is immoral, unethical,

oppressive, unscrupulous or substantially injurious to consumers [the "immoral" test]; or (3) whether the practice's impact on the victim outweighs the reasons, justifications and motives of the alleged wrongdoer [the "balancing" test].

*Doe*, 982 F.3d at 1214–15 (internal citations and quotation marks omitted).

Plaintiffs invoke the immoral and balancing tests to assert an omission theory, arguing that "[Defendant's] decision to conceal its use of a toxic metal in the manufacture of its Stanley cups" is unfair because it is "substantially injurious to consumers," and the impact outweighs Defendant's reasons for the omission. Dkt. No. 56 at 23; *see also* Dkt. No. 48 ¶ 123. Plaintiffs also argue that whether a practice is "unfair" is a question of fact not appropriate for resolution on this motion. *See id.* at 23–24.

For the reasons stated above, *see supra* Sections III.A–B, the Court finds that Plaintiffs have not sufficiently alleged a UCL claim under the "unfair" prong. Plaintiffs do not include sufficient facts to support a finding that the presence of lead in Stanley cups in particular is harmful to consumers such that nondisclosure was "substantially injurious" or fails the balancing test. However, these deficiencies may be cured by amendment.

### 3.    "Fraudulent"

Plaintiffs argue that Defendant violated the "fraudulent" prong of the UCL by: "(1) false and misleading packaging and marketing; and (2) omitting that the cups contained lead, a toxic and lethal substance." Dkt. No. 56 at 24 (citing Dkt. No. 48 ¶¶ 12–24, 122, 124). The Court considers each theory in turn.

### a.    *False and Misleading Statements*

The UCL fraudulent prong, like the FAL and the CLRA, "prohibit[s] not only advertising which is false, but also advertising which [,] although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public." *Williams v. Gerber*

1  *Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (quoting *Kasky v. Nike, Inc.*, 45 P.3d 243, 250

2  (Cal. 2002)) (internal quotation marks omitted).

3        Defendant argues that Plaintiffs do not allege "any awareness whatsoever of any

4  affirmative statement made by Defendant." Dkt. No. 51 at 29. Defendant also argues that the

5  claim fails under Rule 9(b) because Plaintiffs do not sufficiently allege the circumstances of the

6  statements. *See id.* Finally, Defendant argues that Plaintiffs do not allege that any statements

7  were false or misleading. *See id.* at 29–30. In response, Plaintiffs argue that the UCL prohibits

8  misleading as well as false statements, and that they have alleged what those statements are and

9  that they are misleading. *See* Dkt. No. 56 at 24; Dkt. No. 48 ¶ 122.

10        For similar reasons described above, *see supra* Section III.C, the Court finds that

11  Plaintiffs have not sufficiently alleged a fraudulent representation claim under the UCL

12  "fraudulent" prong, because they do not allege that Plaintiffs were aware of any particular

13  affirmative statements by Defendant. However, these deficiencies may be cured by amendment.

### b.  *Omissions*

15        "Omissions may be the basis of claims under California consumer protection laws, but 'to

16  be actionable the omission must be contrary to a representation actually made by the defendant,

17  or *an omission of a fact the defendant was obligated to disclose.*'" *Hodsdon v. Mars, Inc.*, 891

18  F.3d 857, 861 (9th Cir. 2018) (emphasis in original) (quoting *Daugherty v. Am. Honda Motor

19  Co.*, 51 Cal. Rptr. 3d 118, 126 (Cal Ct. App. 2006)). "[T]he law concerning a defendant's duty to

20  disclose in a fraudulent omissions case is 'marked by general disarray.'" *Hammerling v. Google

21  LLC*, 615 F. Supp. 3d 1069, 1085 (N.D. Cal. 2022) (quoting *In re Toyota RAV4 Hybrid Fuel

22  Tank Litig.*, 534 F. Supp. 3d 1067, 1101 (N.D. Cal. 2021)). "The disarray stems in part from the

23  fact that there are (at least) two different tests to determine whether a defendant has a duty to

24

disclose." *Id.* (citing *In re Toyota*, 534 F. Supp. 3d at 1102). The *Hammerling* court explains the tests as follows:

> Under one approach, a defendant only has a duty to disclose when either (1) the defect at issue relates to an unreasonable safety hazard or (2) the defect is material, 'central to the product's function,' and the plaintiff alleges one of the four *LiMandri* factors. [*In re Toyota*, 534 F. Supp. 3d] at 1102. The *LiMandri* factors are: (1) the defendant is in a fiduciary relationship with the plaintiff; (2) the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) the defendant actively conceals a material fact from the plaintiff; or (4) the defendant makes partial representations but also suppresses some material facts. *LiMandri v. Judkins*, . . . 60 Cal. Rptr. 2d 539[, 543] ([Cal. Ct. App.] 1997).
>
> [ ]
>
> Under a separate approach, a defendant has a duty to disclose any time that a plaintiff alleges one of the following: (1) the defect relates to an unreasonable safety hazard; (2) the defect is material and related to the product's central function; <u>or</u> (3) the presence of one of the four *LiMandri* factors. *In re Toyota*, 534 F. Supp. 3d at 1102.

615 F. Supp. 3d at 1085. *But see id.* (applying first approach because "it appears that the Ninth Circuit adopted this approach in [*Hodsdon*]" and "post-*Hodsdon*, the Ninth Circuit and a majority of district courts have applied" that approach).

Defendants argue that Plaintiffs do not allege an unreasonable safety hazard, materiality of the alleged defect, relation of the alleged defect to the Stanley cups' central function, or any of the *LiMandri* factors. *See* Dkt. No. 51 at 30–33. In response, Plaintiffs argue that they have sufficiently alleged all the above (except for the first *LiMandri* factor, which is unaddressed). *See* Dkt. No. 56 at 25–26; Dkt. No. 48 ¶ 122.

For the reasons stated above, the Court finds that Plaintiffs have not sufficiently alleged a fraudulent omission claim under the UCL "fraudulent prong" using either approach, because they do not allege materiality, *see supra* Section III.A, or an unreasonable safety hazard, *see supra* Section III.B. However, these deficiencies may be cured by amendment.

\*   \*   \*

Therefore, as to the Sixth Cause of Action (UCL), Defendant's motion is GRANTED as to all theories, with leave to amend.

**F.    California Consumer Legal Remedies Act ("CLRA")**

Plaintiffs Krohn, Brown, and Robinson bring a claim under the CLRA on behalf of themselves and the putative California subclass. *See* Dkt. No. 48 ¶¶ 127–136 (Seventh Cause of Action).

The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770. Like the UCL, the CLRA prohibits fraudulent omissions. *See Hammerling*, 615 F. Supp. 3d at 1080. "[T]he same standard for fraudulent activity governs" the UCL and the CLRA.[4] *In re Plum Baby Food Litig.*, No. C21-913, 2024 WL 1354447, at \*4 (N.D. Cal. Mar. 28, 2024) (citing *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 996 F. Supp. 2d 942, 985 (S.D. Cal. 2014)), *appeal filed*, No. 24-2766 (9th Cir. May 1, 2024).

Defendant rests on the same arguments it made against the UCL fraudulent theory. *See* Dkt. No. 51 at 33; Dkt. No. 58 at 17. Plaintiffs argue that Defendant violated the CLRA "by failing to disclose that Stanley cups contain lead by design and could expose Plaintiffs to lead toxicity." Dkt. No. 56 at 24. Plaintiffs further argue that "no matter what test is applied, Plaintiffs satisfy them." *Id.* at 25. Applying the same standard that applies to the fraudulent prong of the UCL, and thus for the reasons stated above, *see supra* Section III.E.3.b, the Court finds that Plaintiffs have not sufficiently alleged a CLRA claim.

---

[4] The Parties acknowledge this overlap. *Compare* Dkt. No. 51 at 33, *with* Dkt. No. 56 at 24 n.3.

1    Therefore, as to the Seventh Cause of Action (CLRA), Defendant's motion is GRANTED

2    with leave to amend.

3    **G.    New York Consumer Protection Statutes**

4    Plaintiff Barbu brings claims under two New York statutes for themselves and the New

5    York subclass: (1) New York Deceptive Acts and Practices Law, N.Y. Gen. Bus. Law § 349

6    (Dkt. No. 48 ¶¶ 137–151 (Eighth Cause of Action)); and (2) New York False Advertising Law,

7    N.Y. Gen. Bus. Law § 350 (*id.* ¶¶ 152–161 (Ninth Cause of Action)).

8    "GBL § 349 prohibits '[d]eceptive acts or practices in the conduct of any business, trade

9    or commerce.'" *Montera v. Premier Nutrition Corp.*, 111 F.4th 1018, 1028 (9th Cir. 2024)

10    (quoting N.Y. Gen. Bus. Law § 349). "GBL § 350 prohibits '[f]alse advertising in the conduct of

11    any business, trade or commerce or in the furnishing of any service.'" *Id.* (quoting N.Y. Gen.

12    Bus. Law § 350). "Section 350 specifically addresses false advertising but otherwise has the

13    same broad scope and standard for recovery as § 349." *Id.* (first citing *Karlin v. IVF Am., Inc.*,

14    712 N.E.2d 662, 665 (N.Y. 1999); then citing *Goshen v. Mut. Life Ins. Co. of New York*, 774

15    N.E.2d 1190, 1195 n.1 (N.Y. 2002)). "To succeed on a claim under § 349 or § 350, the plaintiff

16    must show that the defendant 'engaged in (1) consumer-oriented conduct that is (2) materially

17    misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or

18    practice.'" *Id.* (quoting *Koch v. Acker, Merrall & Condit Co.*, 967 N.E.2d 675, 675 (N.Y. 2012)).

19    As to deceptive statements, Defendant argues that Plaintiffs do not identify a false

20    statement by Defendant, do not allege that any true statements were misleading, and do not

21    allege that Plaintiffs relied on any statements in making their purchase (such that the statements

22    caused their injury). *See* Dkt. No. 51 at 34. Defendant argues that the claim also fails under

23    Rule 9(b). *See id.* As to omissions, Defendant argues that the alleged nondisclosure of lead was

24    not material and that it did not have "exclusive knowledge" of the lead. *See id.* at 34–35. Finally,

as to all acts, Defendant argues that Plaintiffs fail to plead injury. *See id.* at 35. In response, Plaintiffs argue that whether statements were materially misleading is a question of fact, and that allegations of "exclusive knowledge" are not required. *See* Dkt. No. 56 at 27. Plaintiffs also argue that they have sufficiently plead injury in the form of a price premium. *See id.* at 27–28.

For the reasons stated above, *see supra* Sections III.A–D, the Court finds that Plaintiff Barbu's New York claims are not sufficiently pleaded. Plaintiff Barbu does not allege that she was aware of any misleading statements prior to purchase, and Plaintiffs generally do not allege that the omission was material. However, these deficiencies could be cured by amendment.

Therefore, as to the Eighth and Ninth Causes of Action (New York statutes), Defendant's motion is GRANTED with leave to amend.

## H.    Nevada Deceptive Trade Practices Act ("NDTPA")

Plaintiff Franzetti brings a claim under the NDTPA for themselves and the Nevada subclass. *See* Dkt. No. 48 ¶¶ 162–170 (Tenth Cause of Action).

Under the NDTPA, a person engages in a "deceptive trade practice" if, as relevant here, he or she "[k]nowingly makes a false representation as to the source, sponsorship, approval or certification of goods or services for sale or lease," Nev. Rev. Stat. § 598.0915(2); "[k]nowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease," Nev. Rev. Stat. § 598.0915(5); or "[r]epresents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model," Nev. Rev. Stat. § 598.0915(7). "To state a claim under the NDTPA, [a plaintiff] must allege '(1) an act of consumer fraud by the defendant (2) caused (3) damage to the plaintiff.'" *Motogolf.com, LLC v. Top Shelf Golf, LLC*, 528 F. Supp.

3d 1168, 1178 (D. Nev. 2021) (quoting *Picus v. Wal-Mart Stores, Inc.*, 256 F.R.D. 651, 658 (D. Nev. 2009)).

Defendant argues that the NDTPA claim fails because Plaintiffs do not allege any false or misleading statements, or awareness or reliance on such statements, and because Plaintiffs do not satisfy Rule 9(b). *See* Dkt. No. 51 at 35–36. In response, Plaintiffs argue that this is an omission claim, not a misrepresentation claim, so causation is established if the omission is material. *See* Dkt. No. 56 at 29. Plaintiffs also argue that Rule 9(b) does not apply. *See id.* at 29–30.

As an initial matter, the Court agrees with Defendant that, as currently alleged, Plaintiff Franzetti brings a claim under provisions of the NDPTA that deal with affirmative misrepresentations. Plaintiff Franzetti cites and quotes Sections 598.0915(2), (5), and (7) (*see* Dkt. No. 48 ¶ 163), then alleges that "[Defendant] violated those provisions" through the actions alleged elsewhere in the CAC (*id.* ¶ 164).[5] Plaintiff Franzetti also refers to representations by Defendant. *See id.* ¶¶ 165–66.

For the reasons stated above, *see supra* Section III.C, the Court finds that Plaintiff Franzetti's NDPTA claim fails because Plaintiff Franzetti does not allege awareness of any misrepresentations that would have caused her to purchase a Stanley cup in error. In fact, she makes no allegation whatsoever that she viewed or was otherwise exposed to *any* representations by Defendant, at any point. *See* Dkt. No. 48 ¶ 3.

Therefore, as to the Tenth Cause of Action (NDTPA), Defendant's motion is GRANTED with leave to amend.

---

[5] The statutory citations in the CAC are further notable for excluding a different provision that appears explicitly related to omissions. *See* Nev. Rev. Stat. § 598.0923(1)(b) (stating that a person engages in a "deceptive trade practice" when he or she "[f]ails to disclose a material fact in connection with the sale or lease of goods or services"); *Poole v. Nev. Auto Dealerships Invs., LLC*, 449 P.3d 479, 482 (Nev. App. 2019) (distinguishing failure-to-disclose claim from misrepresentation claims).

## I.    Unjust Enrichment

Plaintiffs bring a claim for unjust enrichment "under Washington law or the laws of Plaintiffs' respective states of residence for members of the respective State Subclasses." Dkt. No. 48 ¶ 171; *see id.* ¶¶ 171–74 (Eleventh Cause of Action).

Unjust enrichment "occurs when one retains money or benefits which in justice and equity belong to another." *Bailie Commc'ns, Ltd. v. Trend Bus. Sys., Inc.*, 61 Wn. App. 151, 160, 810 P.2d 12 (1991). This cause of action "is the method of recovery for the value of the benefit retained absent any contractual relationship because notions of fairness and justice require it." *Young v. Young*, 164 Wn.2d 477, 484, 191 P.3d 1258 (2008) (citing *Bailie Commc'ns*, 61 Wn. App. at 160). To state a claim for unjust enrichment, Plaintiff must show: "[1] a benefit conferred upon the defendant by the plaintiff; [2] an appreciation or knowledge by the defendant of the benefit; and [3] the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *Young*, 164 Wn.2d at 484 (quoting *Bailie Commc'ns*, 61 Wn. App. at 159–60).

Defendant argues that the claim fails because Plaintiffs do not allege "appreciation or knowledge of the benefit" or "circumstances" that "make it inequitable" to retain any benefit (as there has been no inequitable conduct in the form of omissions or representations). *See* Dkt. No. 51 at 36–37. Defendant further argues that Plaintiffs' unjust enrichment claims under other states' laws fail for the same reason. *See id.* at 37. In response, Plaintiffs allege that all elements are sufficiently pleaded. *See* Dkt. No. 56 at 30–31.

For the reasons stated above, *see supra* Sections III.A–D, the Court finds that Plaintiffs have not sufficiently pleaded a claim for unjust enrichment under Washington law, because Plaintiffs do not allege "circumstances as to make it inequitable" for Defendant to retain any alleged benefit. Moreover, Plaintiffs do not sufficiently allege a claim for unjust enrichment under any other state's

law, insofar as Plaintiffs do not explain how those claims are materially distinguishable from those recognized in Washington. However, these deficiencies may be cured by amendment.

Therefore, as to the Eleventh Cause of Action (unjust enrichment), Defendant's motion is GRANTED with leave to amend.

## J.    Fraudulent Omission

Finally, Plaintiffs bring a claim for fraudulent omission under Washington law on behalf of the putative nationwide class. *See* Dkt. No. 48 ¶¶ 175–84 (Twelfth Cause of Action). "To establish fraud under Washington law, '[t]he plaintiff may affirmatively plead and prove the nine elements of fraud or may simply show that the defendant breached an affirmative duty to disclose a material fact.'" *Zwicker v. Gen. Motors Corp.*, No. C07-291, 2007 WL 5309204, at *4 (W.D. Wash. July 26, 2007) (quoting *Crisman v. Crisman*, 85 Wn. App. 15, 21, 931 P.2d 163 (1997)). "The nine elements of fraud are: (1) representation of an existing fact; (2) materiality; (3) falsity; (4) the speaker's knowledge of its falsity; (5) intent of the speaker that it should be acted upon by the plaintiff; (6) plaintiff's ignorance of its falsity; (7) plaintiff's reliance on the truth of the representation; (8) plaintiff's right to rely upon it; and (9) damages suffered by the plaintiff." *Stiley v. Block*, 130 Wn.2d 486, 505, 925 P.2d 194 (1996). "When a duty to disclose does exist . . . the suppression of a material fact is tantamount to an affirmative misrepresentation." *Wurts v. City of Lakewood*, No. C14-5113, 2015 WL 1954663, at *11 (W.D. Wash. Apr. 29, 2015) (citing *Wash. Mut. Sav. Bank v. Hedreen*, 125 Wn.2d 521, 526, 886 P.2d 1121 (1994)).

Defendant argues that Plaintiffs do not allege that "the nondisclosure of lead in Stanley cups would be material to a reasonable consumer." Dkt. No. 51 at 37. Defendant also argues that the claim fails Rule 9(b). *See id.* at 37–38. In response, Plaintiffs argue that they have pleaded all the elements of fraudulent omission, including materiality, and that they have satisfied Rule 9(b)'s relaxed standard for such claims. *See* Dkt. No. 56 at 31–32.

For the reasons stated above, *see supra* Section III.A, the Court finds that Plaintiffs have not sufficiently pleaded a claim for fraudulent omission because they do not sufficiently allege the presence of lead in the Stanley cups was a material fact that should have been disclosed. However, these deficiencies may be cured by amendment.

Therefore, as to the Twelfth Cause of Action (fraud by omission), Defendant's motion is GRANTED with leave to amend.

## IV.    CONCLUSION

Accordingly, it is hereby ORDERED:

(1)    Defendant Pacific Market International, LLC's Motion to Dismiss (Dkt. No. 51) is GRANTED.

    (a)    The Fourth Cause of Action (breach of implied warranty of merchantability) is DISMISSED without leave to amend.

    (b)    All other causes of action are DISMISSED with leave to amend.

    (c)    Should Plaintiffs choose to file an Amended Consolidated Class Action Complaint, any such amended complaint SHALL be filed **within forty-five (45) days** of this Order. Defendant SHALL respond to any amended complaint **within thirty (30) days** after its filing.

(2)    Defendant's pending Motion Under Fed. R. Civ. P. 12(f) to Strike the Complaint's Nationwide Class Allegations (Dkt. No. 52) is STRICKEN as moot, with leave to refile as appropriate.

Dated this 17th day of January 2025.

Tana Lin
United States District Judge