UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| IN RE: PACIFIC MARKET INTERNATIONAL, LLC, STANLEY TUMBLER LITIGATION | CASE NO. 2:24-cv-00191-TL |
| | ORDER ON MOTION TO DISMISS |
| This Document Relates to: All Actions | |

This is an action for damages and injunctive relief stemming from the use of lead in the manufacture of Stanley-brand drinkware and the manufacturer's alleged failure to disclose the presence of lead in those products. This matter is before the Court on Defendant Pacific Market International, LLC's Motion to Dismiss the Amended Consolidated Class Action Complaint ("ACCAC"). Dkt. No. 73. Having reviewed Plaintiffs' response (Dkt. No. 79), Defendant's reply (Dkt. No. 82), and the relevant record, and finding oral argument unnecessary, *see* LCR 7(b)(4), the Court GRANTS the motion with leave to amend.

//

//

ORDER ON MOTION TO DISMISS – 1

#### I.    BACKGROUND

**A.    The Parties**

Plaintiffs are six residents of various states (California, Nevada, New York, and Washington), each of whom who purchased one or more "Stanley tumblers"[1] for personal, family, or household use at various times between June 1, 2019, and January 4, 2024.[2] *See* Dkt. No. 68 ¶¶ 25–30, 109. Each Plaintiff "believed she was buying a product that would not expose her or her family to lead and that it would safely store liquids without fear of exposure to toxins." *Id.*[3] Before purchase, "Plaintiff Franzetti saw materials describing [the tumbler's] characteristics, including that it was made from stainless steel, dishwasher safe, and easy to clean." *Id.* ¶ 25. "Plaintiff Robinson saw representations that the tumblers were 'durable,' 'stay hot 24H,' and [were] 'rugged.'" *Id.* ¶ 29.

All Plaintiffs "did not reasonably expect these tumblers to contain a toxic heavy metal like lead." *Id.* ¶ 31. All Plaintiffs would not have bought the Stanley tumblers, or would "have paid considerably less" for them, had they known they contained lead. *Id.* ¶¶ 25–30. All Plaintiffs have stopped using the Stanley tumblers. *Id.* Most Plaintiffs "would consider purchasing the tumblers in the future if they were certain the tumblers were no longer manufactured with lead." *Id.* ¶ 34.

//

//

---

[1] In the Amended Consolidated Class Action Complaint, "'[Stanley] tumblers' refers to drinkware or related products manufactured by [Defendant] that include lead in their design or manufacture." Dkt. No. 68 ¶ 5 n.1. The tumblers in question are sold under the Stanley brand. *Id.* ¶ 3. Following the practice of the Parties, the Court uses the term "Stanley tumblers" to refer to the products at issue in this litigation.

[2] One Plaintiff, Plaintiff Barbu, purchased one or more additional tumblers in or around March 2024. Dkt. No. 68 ¶ 26.

[3] The quoted phrase appears in each of the cited paragraphs, with two variations: the allegations as to Plaintiff Robinson omit the phrase "or her family" (Dkt. No. 68 ¶ 29), and the allegations as to Plaintiff Krohn omit the word "safely" (Dkt. No. 68 ¶ 27).

Defendant Pacific Market International, Inc. ("PMI") is a Washington limited liability company with its principal place of business in Seattle, Washington. *Id.* ¶ 35. Defendant "designs, manufactures, packages, labels, markets, advertises, distributes, and sells the Stanley tumblers throughout the United States, including in and from this District." *Id.*

**B.      Defendant's Marketing and Representations**

Defendant's marketing materials represent that Stanley tumblers are "made of rugged stainless steel" and can "help you live a sustainable lifestyle." *Id.* ¶ 78. Defendant targeted advertising at "millennial and Gen-Z women" as well as "adventurers and consumers who enjoy an active lifestyle." *Id.* ¶ 41. Defendant's marketing "has also included paying social media influencers with large followings in PMI's target demographics to promote Stanley tumblers." *Id.* ¶ 42. Prior to January 2024, none of Defendant's advertising informed consumers that the tumblers contained lead or stated that a damaged tumbler could pose a safety risk by exposing the user to lead. *Id.* ¶¶ 7, 16, 41.

Between 2019 and 2023, annual "sales of Stanley tumbler[s] skyrocketed" from $70 million to about $750 million worldwide.

**C.      Use of Lead in Stanley Cups**

In late January 2024, the presence of lead in the Stanley cups was made public through news of third-party investigations. *Id.* ¶ 44. Reports of these investigations "went viral on social media" and were "cover[ed] in national news outlets both online and on television[.]" *Id.* That same month, Defendant "admitted to using lead in the design and manufacturing of Stanley tumblers and that consumers could be exposed to lead if a Stanley tumbler is damaged." *Id.* ¶ 47; *see id.* ¶ 59. By February 2, 2025, Defendant had posted the following statement on its website:

**Do Stanley products contain lead?**

At Stanley, one of the key features of our products is our vacuum

> insulation technology, which provides consumers with drinkware that keeps beverages at the ideal temperature. Our manufacturing process currently employs the use of an industry standard pellet to seal the vacuum insulation at the base of our products; the sealing material includes some lead. Once sealed, this area is covered with a durable stainless steel layer, making it inaccessible to consumers. Rest assured that no lead is present on the surface of any Stanley product that comes into contact with the consumer nor the contents of the product. In the rare occurrence the base cap of a product comes off due to ordinary use and exposes this seal, it is eligible for our Lifetime Warranty, available here: **https://www.stanley1913.com/pages/contact-warranty**
>
> Stanley assures that its products meet all US regulatory requirements including Prop65. Stanley tests for and validates compliance on all products through FDA accredited 3rd party labs that verify our products follow strict guidelines including but not limited to BPA/BPS, PFOS, and phthalate regulatory requirements.

*Do Stanley Products Contain Lead?*, Stanley 1913, https://web.archive.org/web/20240412044752/https://support.stanley1913.com/en/support/solutions/articles/69000850923-do-stanley-products-contain-lead (archived Apr. 12, 2024) (boldface in original) (cited by Dkt. No. 68 ¶ 59).[4] Defendant continues to sell its Stanley cups without change to its manufacturing or marketing practices. Dkt. No. 68 ¶ 47. Defendant has not offered refunds for consumers who purchased Stanley tumblers without knowing they contain lead. *Id.* ¶ 65.

"Lead is a highly toxic heavy metal, identified as a carcinogen, and whose harmful effects cannot be reversed or remediated due to its accumulation in the body over time." *Id.* ¶ 48. Leading U.S. and global health authorities agree that no amount of lead is safe for human

---

[4] As it did in dismissing the previous complaint, the Court notes that it may consider the web pages and articles referenced by Plaintiffs to the extent that Plaintiffs' claims depend on their contents, as those materials are incorporated by reference in the ACCAC. *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (incorporation by reference applies where "plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint"); *see also In re Amazon Serv. Fee Litig.*, 705 F. Supp. 3d 1255, 1261 n.1 (W.D. Wash. 2023) (incorporating online articles by reference). The web pages and articles quoted in this Order are critical to Plaintiffs' allegations regarding representations made by Defendant and the materiality of the presence of lead in the Stanley tumblers. Moreover, Defendant does not dispute the authenticity of any web page or article.

ORDER ON MOTION TO DISMISS – 4

exposure or consumption. *Id.* ¶¶ 2, 49. According to the Food and Drug Administration ("FDA"), lead "can seriously harm the brain and nervous system in children and is associated with a range of adverse health outcomes such as behavioral problems, decreased cognitive performance, delayed puberty, reduced postnatal growth, increased incidence of attention-related behaviors and problem behaviors, and decreased hearing." *Id.* ¶ 51. Lead is also harmful to adults, in whom it can affect many body systems and cause many harmful outcomes. *Id.* ¶ 52. Lead in the body builds up over time and can disrupt neurological, skeletal, reproductive, hematopoietic, renal, and cardiovascular systems. *Id.* ¶ 53. In October 2024, the "action level" for lead in tap water under U.S. Environmental Protection Agency ("EPA") regulations was lowered to just 10 parts per billion ("ppb"). *See id.* ¶ 54. Before that (and presumably during the time period relevant to this action, the action level was set at 15 ppb. *Id.* The EPA has set a goal of reducing lead in tap water to zero. *Id.* In January 2025, the FDA set action levels of lead ranging from 10 ppb to 20 ppb in processed foods for infants and children under two years old. *Id.* ¶ 55.[5]

Defendant claims that using lead to seal insulation is the "industry standard," but at least four other manufacturers use lead-free solder and manufacturing processes that do not use lead. *Id.* ¶ 68–72. Although competitors say these alternatives are more costly and complex, a 40-ounce tumbler manufactured by Hydro Flask, which does not use lead in its products, retails for $5 less than its lead-containing Stanley counterpart. *Id.* ¶¶ 69–71.

**D.    Procedural History**

This matter began as three proposed class actions. *See* Dkt. No. 31 (Order on Motion to Consolidate Cases) at 2–4. *Id.* On April 26, 2024, these cases were consolidated. Dkt. No. 31. On May 16, 2024, a related case was also consolidated with these cases. Dkt. No. 42. The same day,

---

[5] The ACCAC does not plead facts relating to regulations of processed foods for infants and children before 2025 (that is, during the period when the asserted claims arose).

interim class counsel was appointed. Dkt. No. 43.

On June 18, 2024, Plaintiffs filed a Consolidated Class Action Complaint ("CAC") asserting 12 causes of action against Defendant arising under common-law tort, the federal Magnuson-Moss Warranty Act, and the consumer-protection laws of Washington, California, New York, and Nevada. Dkt. No. 48.[6] In the CAC, Plaintiffs sought a permanent injunction requiring Defendant to disclose any lead and other toxins at the point of sale, on packaging, and in advertisements; to perform a corrective advertising campaign informing consumers that the cups contain lead; to warn consumers to stop using the cups if they are damaged; and to stop using a cup design that includes lead. *Id.* ¶ 51. Plaintiffs sought compensatory and statutory damages refunding consumers for all amounts paid for the Stanley cups, as well as punitive damages for Defendant's "deliberate concealment" of its use of lead and the chance that a damaged cup could expose consumers to lead. *Id.* Plaintiffs sought to represent a nationwide class as well as subclasses from Washington, California, New York, and Nevada. *Id.* ¶ 52.

Defendant moved to dismiss the CAC. Dkt. No. 51; *see also* Dkt. Nos. 56 (response); 58 (reply). On January 17, 2025, the Court granted the motion and dismissed the CAC in its entirety. Dkt. No. 66 at 31. The Court dismissed Plaintiffs' claim for breach of the implied warranty of merchantability with prejudice, finding that Plaintiffs did not (and could not) allege the required element of privity, and that any amendment would be futile. *Id.* at 19. The Court dismissed all remaining claims with leave to amend. *Id.* at 31. Plaintiffs filed an amended complaint on March 3, 2025. Dkt. No. 68. The Amended Consolidated Class Action Complaint ("ACCAC") seeks essentially the same relief at the CAC, with the most notable difference being that Plaintiffs no longer seek injunctive relief preventing Defendant from using lead in the

---

[6] Shortly after filing the CAC, Plaintiffs voluntarily dismissed their claim under the Magnuson-Moss Warranty Act. *See* Dkt. No. 47.

Stanley tumblers. *Compare* Dkt. No. 68 ¶ 230, *with* Dkt. No. 48 ¶ 51. The ACCAC asserts two tort claims on behalf of a proposed nationwide class, as well as six statutory claims on behalf of the named Plaintiffs (except Plaintiff Rydman)[7] and proposed state subclasses arising under their respective consumer-protection laws.

Defendant now brings the instant motion to dismiss the ACCAC. Dkt. No. 73; *see also* Dkt. No. 82 (reply). Plaintiffs oppose. Dkt. No. 79. Defendant has also moved to strike Plaintiffs' nationwide class allegations, which Plaintiffs oppose. Dkt. Nos. 74 (motion), 80 (response), 83 (reply).

## II.    LEGAL STANDARD

A defendant may seek dismissal when a plaintiff fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In reviewing a Rule 12(b)(6) motion to dismiss, the Court takes all well-pleaded factual allegations as true and considers whether the complaint "state[s] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient, a claim has "facial plausibility" when the party seeking relief "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 672. "When reviewing a dismissal pursuant to Rule . . . 12(b)(6), 'we accept as true all facts alleged in the complaint and construe them in the light most favorable to plaintiff[], the non-moving party.'" *DaVinci Aircraft, Inc. v. United States*, 926 F.3d 1117, 1122 (9th Cir. 2019) (alteration in original) (quoting *Snyder & Assocs. Acquisitions LLC v. United States*, 859 F.3d 1152, 1156–57 (9th Cir. 2017)).

---

[7] The one remaining Washington statutory claim is brought "on Behalf of the Class, or the Washington Subclass."

A defendant may also seek dismissal when a plaintiff fails to plead "with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003) (deeming a motion to dismiss under Rule 9(b) "the functional equivalent" of a motion to dismiss under Rule 12(b)(6) and thus treating dismissal under both rules "in the same manner"). Under Rule 9(b), a plaintiff must normally plead "'the who, what, when, where, and how' of the misconduct charged." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (quoting *Vess*, 317 F.3d at 1106)). Where claims are grounded in fraud, a plaintiff also must identify "what is false or misleading about the purportedly fraudulent statement, and why it is false." *Davidson v. Sprout Foods, Inc.*, 106 F.4th 842, 852 (9th Cir. 2024) (quoting *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011)).

Finally, the Rule 9(b) standard "is relaxed in fraudulent omission cases." *Short v. Hyundai Motor Co.*, 444 F. Supp. 3d 1267, 1279 (W.D. Wash. 2020). "In such cases, a plaintiff 'will not be able to specify the time, place, and specific content of an omission as precisely as would a plaintiff in a false representation claim.'" *Id.* (quoting *Falk v Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1098–99 (N.D. Cal. 2007)). "Nonetheless, a plaintiff pleading fraudulent omission or concealment must still plead the claim with particularity." *Id.* (quoting *Ashgari v. Volkswagen Grp. of Am., Inc.*, 42 F. Supp. 3d 1306, 1325 (C.D. Cal. 2013)).

### III.    DISCUSSION

The ACCAC asserts eight[8] causes of action: tort claims for unjust enrichment and fraudulent omission and statutory claims for violations of Washington's Consumer Protection Act, California's Unfair Competition Law and Consumer Legal Remedies Act, New York's

---

[8] The ACCAC's causes of action begin with "COUNT I" and continue through "CLAIM XI," skipping numbers III, V, and IX, and switching from the "COUNT" nomenclature to "CLAIMS" beginning with Claim VIII. For clarity, the Court adopts Plaintiffs' numbering but will refer to all causes of action as "claims."

Deceptive Acts and Practices Law and False Advertising Law, and Nevada's Deceptive Trade Practices Act. Plaintiffs chose not to amend two claims the Court had dismissed, for breach of express warranty and design defect in violation of the Washington Product Liability Act.

The Court will discuss the applicable pleading standard, examine the differences between the CAC and the ACCAC as they relate to the deficiencies it identified, discuss whether changes to the ACCAC have cured the CAC's pleading deficiencies as to Defendant's omissions and representations, respectively, and then consider in turn whether each of the remaining claims should be dismissed.

## A.    Rule 9(b)'s Heightened Pleading Standard

As an initial matter, the Court finds that Rule 9(b) applies to all Plaintiffs' claims. Rule 9(b) is a federal procedural rule that applies to both federal and state-law claims that are "grounded in fraud"—that is, where "the plaintiff [chooses to] allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim," even if the word "fraud" is not used, and even if fraud is not a necessary element of the claim. *Vess*, 317 F.3d at 1103. All eight of Plaintiffs' claims are based on a single course of conduct:

> PMI . . . knowingly and unfairly failed to disclose [that its popular Stanley tumblers contain lead] because it knew this material information could hurt its PMI's [*sic*] bottom line and contradict the high premium price attached to the Stanley tumblers. PMI should have conveyed the existence of these alleged defects in any manner prior to the sales of such products. However, PMI did not disclose this material and has done nothing but conceal these facts until very recently, failing to disclose and keeping this material fact hidden from consumers.

Dkt. No. 68 ¶ 8; *see also id.* ¶¶ 37 ("PMI knowingly created . . . fraudulent, unfair, misleading, and/or deceptive labeling . . . ."); 76 ("actively and knowingly concealed"); 82 ("deceived reasonable consumers by actively concealing") 93 (commissions "were intended to and did" induce consumers to "buy products they likely would not have purchased has the actual quality

ORDER ON MOTION TO DISMISS – 9

of the Stanley tumblers been disclosed"); 101 (same); 196 ("knowingly made an implicit false representation that its products were safe"); 218 ("actively and knowingly concealed . . . that the Stanley tumblers contained lead"); 227 (Defendant "intended to induce Plaintiffs and the Class to buy the Stanley tumblers by concealing the presence or use of lead"); 230 (seeking punitive damages for "deliberate concealment" of use of lead). Plaintiffs' attempts to avoid Rule 9(b)'s heightened pleading standard all fail. The contention that they do "need not prove fraud or intention for most of their claims" (Dkt. No. 79 at 18) is irrelevant, *see REX—Real Est. Exch. Inc. v. Zillow Inc.*, No. C21-312, 2021 WL 3930694, at *8 (W.D. Wash. Sept. 2, 2021), and the suggestion that the ACCAC "does not allege a 'unified fraudulent course of conduct'" (*id.* at 19) is absurd. Now that the warranty claims have been dismissed or abandoned, *all* Plaintiffs' claims are based on knowing and intentional misrepresentations and omissions—in other words, fraud.

Finally, as Defendant point out, all of Plaintiffs' causes of action have been held to require pleading compliant with Rule 9(b) when based on allegations of misrepresentations and fraudulent omissions. *See REX*, 2021 WL 3930694, at *8 (Washington Consumer Protection Act claim); *Kearns v. Ford Motor Co.*, 567 F.3d at1127  (California statutory claims); *Margolis v. Apple Inc.*, 743 F. Supp. 3d 1124, 1132, 1137 (N.D. Cal. 2024) (New York statutory claims); *Horner v. Mortg. Elec. Registration Sys., Inc.*, 711 F. App'x 817, 818 (9th Cir. 2017) (Nevada Deceptive Trade Practices Act); *Ferrie v. Woodford Rsch., LLC*, No. C19-5798, 2020 WL 3971343, at *13 (W.D. Wash. July 14, 2020) (unjust enrichment); *Krakauer v. Recreational Equip., Inc.*, No. C22-5830, 2024 WL 1494489, at *9–12 (W.D. Wash. Mar. 29, 2024) (fraudulent omission).

**B.       Materiality of Omissions**

Except for the Nevada statutory claim (which, as pleaded in the CAC, was based only on affirmative representations), all the claims now re-alleged were dismissed, in whole or in part,

ORDER ON MOTION TO DISMISS – 10

because Plaintiffs had not plausibly pleaded that its omission of information about the lead sealing pellet in its labeling and marketing was actionable as a *material* omission. Materiality is a required element of all Plaintiffs' causes of action, to the extent that the complained-of conduct is an omission, not an affirmative representation.[9]

In dismissing Plaintiffs' claim under the Washington Consumer Protection Act ("CPA" or "WCPA"), the Court explained:

> Plaintiffs have not sufficiently alleged that the omission was material, as they have not shown sufficient harm from the specific amount of lead in the Stanley cups. *See Davidson* [*v. Sprouts Foods, Inc.*, 106 F.4th 842, 853 (9th Cir. 2024)], (where plaintiffs alleged economic harm, dismissing fraud-based claims under Rule 9(b) because allegations of physical harm were "largely unspecific" to defendant's products, lacked context, or were speculative). Contrary to Plaintiffs' assertion, "specific lead levels and physical harm" *are* at issue—not because Plaintiffs allege physical harm (which they do not), and not because they need to allege actual consumption of or exposure to lead (which they do not), but because they allege that the use of lead was material due to the attendant risk of physical harm. *See, e.g.*, Dkt. No. 48 ¶¶ 3–10, 26, 30–31, 36, 45. Thus, without sufficient allegations to show that the lead in the Stanley cups could pose actual harm to consumers, "the apparent need for disclosure is a moot proposition." *Wilson v. ColourPop Cosmetics, LLC*, No. C22-5198, 2023 WL 6787986, at *5 (N.D. Cal. Sept. 7, 2023) (in context of Article III standing, further observing that "Plaintiff's claim for economic loss also necessarily relies on establishing the Products she purchased have been deemed unsafe" and "this 'loss

---

[9] The Court previously noted that materiality did not appear to be a requirement for CPA claims but applied the standard as it had been briefed by the parties. *See* Dkt. No. 66 at 8 n.2.

Upon review, the Court agrees with Defendant that it overstated the meaning of the Washington Supreme Court's rejection of the proposition that "materiality [i]s necessary as a matter of law" for a CPA claim. *See* Dkt. No. 66 at 8 n.2 (quoting *Young v. Toyota Motor Sales USA*, 196 Wn.2d 310, 318, 472 P.3d 990 (2020)). Defendant convincingly argues that while *representations* need not be material to be actionable under the CPA, *omissions* do. *See* Dkt. No. 73 at 17–18 (citing *Rydman v. Champion Petfoods USA, Inc.*, No. C18-1578, 2023 WL 3506133, at *7 (W.D. Wash. May 17, 2023) ("The decision in *Young*, relating to affirmative misrepresentations, does not appear to have disturbed jurisprudence requiring that materiality be proven when a CPA plaintiff alleges harm based on an omission or failure to disclose."); *Lohr v. Nissan N. Am., Inc.*, No. C16-1023, 2022 WL 1449680, at *3 (W.D. Wash. May 9, 2022) ("Where the alleged 'act' is a failure to disclose, the plaintiff must prove the omitted fact was material.")). This makes sense, as imposing liability for the omission of immaterial information implicates fundamental fairness concerns. It is much more reasonable to hold a Defendant responsible for all the things they say than for *all* the things they don't say.

ORDER ON MOTION TO DISMISS – 11

of money' requires a showing that the Products are *actually harmful*" (emphasis in original)).

Dkt. No. 66 at 9–10. The Court was unequivocal about what Plaintiffs needed to show to establish materiality: "Without additional factual support that demonstrates a specific and plausible risk of harm *from the lead in Stanley cups*, the mere presence of lead could not be material to a reasonable consumer." *Id.* at 13. (emphasis added). The Court referenced the same analysis in finding that Plaintiff had not pleaded specific facts establishing unfair practices, materiality, or an unreasonable safety hazard for the California statutory claims (*id.* at 22, 24), materiality for the New York claims (*id.* at 27), inequitable circumstances demonstrating unjust enrichment (*id.* at 29), or materiality for the fraudulent-omission claim (*id.* at 31).

Plaintiffs argue they have cured this deficiency by "including new details about lead concentrations found in the Tumblers, references to authoritative health agency guidance, the results of a new consumer survey addressing the Court's concerns about materiality, and new allegations linking PMI's omissions to consumer deception and economic harm." Dkt. No. 79 at 14 (citing Dkt. No. 68 ¶¶ 2, 12, 45, 49, 56). Defendant maintains that the ACCAC "suffers from exactly the same defects as its predecessor" and should be dismissed in full. Dkt. No. 73 at 31.

The Court agrees with Defendant. Plaintiffs attempt to show materiality by demonstrating "a specific and plausible risk of harm from the lead in Stanley cups," as the Court instructed, and also renew their efforts to show materiality *notwithstanding* any potential risk of harm, now by alleging new facts from a consumer opinion survey. But both efforts fail.

### 1.　Plaintiffs Do Not Plead a Specific and Plausible Risk of Harm

Plaintiffs' previously conclusory assertion that *no amount of lead is safe* is now plausibly pleaded as it relates to items intended for human *consumption*. *See* Dkt. No. 68 ¶ 2. Plaintiffs state that the FDA, the U.S. Centers for Disease Control and Prevention ("CDC"), the American

ORDER ON MOTION TO DISMISS – 12

Academy of Pediatrics ("AAP"), and the World Health Organization ("WHO") have all stated that, "as this substance is known to accumulate in the body," "there is no safe amount of exposure to lead[.]'"[10] *Id*; *accord id.* ¶ 49. Plaintiff cites publications from three of these four organizations, confirming the organizations' common position that lead is unsafe at any level in the human body, in drinking water, or in food. *See* Dkt. No. 68 ¶ 49 n.14 (citing, *inter alia*, *Lead in Food and Foodwares*, Food & Drug Admin., https://www.fda.gov/food/environmental-contaminants-food/lead-food-and-foodwares (Jan. 6, 2025); *Health Effects of Lead Exposure*, Ctrs. For Disease Control, https://web.archive.org/web/20240429041027/https://www.cdc.gov/nceh/lead/prevention/health-effects.htm (archived Apr. 29, 2024); *Lead Poisoning*, World Health Org., https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health [https://perma.cc/LD5P-26BN] (archived Apr. 2, 2026). Plaintiffs' authorities, which the Court incorporates by reference for the purpose of showing the existence of the statements therein, *see supra* n.1, confirm that these organizations have warned that lead in food and water is dangerous because lead exposes the body to its harmful effects *when it is consumed*, even in very small amounts. They also support concerns about lead in contaminated dust and soil, water pipes, and packaging that directly touches food. The WHO fact sheet warns that, besides "ingestion," lead exposure "mainly" results from "inhalation of lead particles generated by burning materials containing lead."

---

[10] While Plaintiffs present the statement "there is no safe amount of exposure to lead" as a direct quote from a WHO fact sheet, the cited publication does not contain this quote. The most similar statements on the page are "There is no level of exposure to lead that is known to be without harmful effects," and "There is no known safe blood lead concentration." *See Lead Poisoning*, World Health Org., https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health [https://perma.cc/LD5P-26BN] (archived Apr. 2, 2026). Similarly, although Plaintiffs' statement that "[i]n setting the action level, the EPA conceded it is 'not a health-protective level—only zero lead is safe'" appears to attribute a quotation to the EPA, the actual source of the quote is the nonprofit advocacy organization National Resources Defense Council. *See* Dkt. No. 68 ¶ 54 n.19. Plaintiffs' counsel is reminded that material enclosed in quotation marks is expected to be a verbatim recitation of the source to which it is attributed.

But neither these authorities nor any facts specifically pleaded by Plaintiffs suggest that the mere presence of lead in a person's surroundings or in consumer goods is dangerous, or that lead can cause harm without being ingested or inhaled.[11] And the ACCAC does not allege that the lead sealing pellet in the base of a Stanley tumbler can contaminate its contents, otherwise be ingested or inhaled, or come into contact with consumers at all, as long as it is sealed inside the base of the product under a steel cover. Even if the steel cover were to be damaged or lost (a circumstance Plaintiffs allege *can* happen, but do not allege is likely or ever has happened in the course of ordinary use[12]), exposing the lead, the ACCAC contains no "allegation that exposed lead causes physical harm." Dkt. No. 73 at 11. Plaintiffs plead no facts suggesting damage would put the lead in contact with any liquid or other contents of the tumbler (such that it could contaminate them), and generally lacks any explanation of how an exposed sealing pellet, or any part of it, might enter a consumer's body and cause harm.

One new fact pleaded by Plaintiff is that "[i]ndependent testing of Stanley tumblers revealed lead levels of 400,000 parts per *million* ("ppm") and possibly as high as 600,000 ppm." Dkt. No. 68 ¶ 45. In other words, some part of the Stanley tumblers (presumably the lead sealing pellet of unknown size) is 40–60% lead. But even if the pellet were 100% lead, the fact remains that Plaintiffs have not pleaded any way that the pellet or any lead particles it contains might

---

[11] The CDC website Plaintiffs cite lists "touching, swallowing, or breathing in lead or lead dust" as instances of lead exposure for children, but continues, "Young children also tend to put their hands or other objects, which may be contaminated with lead dust, into their mouths, so they are more likely to be exposed to lead than older children," suggesting that touching is mainly dangerous as a precursor to ingestion. It is not evident from this source or the others (and Plaintiffs do not allege) that lead can enter the body through the skin.

[12] The ACCAC repeatedly alleges that the internal lead component can be damaged in the course of ordinary use, but the only specific fact related to this assertion is Defendant's alleged "admi[ssion]" that the steel layer "may come off.'" (Dkt. No. 68 ¶ 59 (quoting *Do Stanley Products Contain Lead? supra*)). The original statement by Defendant is that "[i]n the rare occurrence the base cap of a product comes off due to ordinary use and exposes this seal, it is eligible for our Lifetime Warranty." *Do Stanley Products Contain Lead? Supra*. Plaintiffs include a TikTok image showing that at least one Stanley tumbler has lost its seal, but they do not allege that this happened through ordinary use. Dkt. No. 68 ¶ 12.

ORDER ON MOTION TO DISMISS – 14

enter the bodies of Plaintiffs or their families, "exposing" them to the harmful effects of lead.[13] Defendant raised this point in its motion to dismiss, and Plaintiffs offered no response. *See* Dkt. No. 73 at 11–12; *see generally* Dkt. No. 79. Without even a hypothetical explanation of how any consumer might be harmed by the lead in Defendant's product, the problem remains that the dangers Plaintiffs warn of "are completely disconnected from the Stanley cups . . . ." Dkt. No. 66 at 10.

### 2. Plaintiffs' Survey Does Not Demonstrate Materiality

Plaintiffs also add to the ACCAC results of a new "consumer survey recently conducted by Plaintiffs' counsel," in an effort to show that the use of lead in Stanley tumblers is "material," because it is "a fact to which a reasonable person would attach importance in determining their choice of action in the transaction in question" —irrespective of any potential for harm. Dkt. No. 79 at 20 (citation modified) (quoting *Zunum Aero, Inc. v. Boeing Co.*, No. C21-0896, 2022 WL 2116678, at *13 (W.D. Wash. June 13, 2022)). Plaintiffs pair this newly proposed "materiality" standard with their (questionable) survey data suggesting that most surveyed respondents report that they would consider it "important" or "very important" to their purchasing decision if an insulated tumbler (presented by way of a generic image) was "manufactured with lead." Dkt. No. 68 ¶¶ 90–92.[14]

---

[13] Webster's dictionary includes at least ten definitions for the verb *expose*, in three categories. When a lead component of a product is *exposed* though damage—that is, it is "cause[d] to be visible or open to view"—it does not automatically follow that users and their families are *exposed* to lead—that is, "subject[ed] to risk from a harmful action or condition." *Expose*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com /dictionary/expose (Last visited Apr. 2, 2026). Plaintiffs need to plead facts that plausibly connect the dots between exposure *of* lead and exposure *to* lead; they may not rely on the convenient fact that two different concepts happen to be expressed through a single word.

[14] This survey asked respondents three questions:

- "How important, if at all, would it be to your purchasing decision if the product above [referring to an image of a generic insulated stainless-steel tumbler] was manufactured with lead?"

- "Would you want to know if a product you planned to purchase was manufactured with lead?"

There are several problems with this approach.

First, the Court has already rejected it. *See* Dkt. No. 66 at 13 (finding that "[w]ithout additional factual support that demonstrates a specific and plausible risk of harm from the lead in Stanley cups, the mere presence of lead could not be material to a reasonable consumer.") Plaintiffs do not explain why the Court was wrong, nor do they attempt to distinguish their new attempt to sidestep a showing of plausible harm from the theory the Court previously rejected.

Second, the standard Plaintiffs urge the Court to adopt is not applicable the fraudulent-omission-based claims they assert. Plaintiffs' definition of "material fact" applies specifically to that phrase as used in the Securities Act of Washington, RCW 21.20.010(2). *Morris v. Int'l Yogurt Co.*, 107 Wn.2d 314, 323, 729 P.2d 33 (1986) (citing *Clausing v. DeHart*, 515 P.2d 982, 984 (Wash. 1973)). The *Morris* Court applied the same definition in interpreting similar language in the Franchise Investment Protection Act, RCW 19.100.170(2), *id.* at 323–33, but otherwise, it appears that Washington courts have only ever applied this rule—which applies without qualification to "untrue statements of material facts," not omissions[15]—to actions under

---

- "If two products were identical in size, weight, color, features, and price, but one was manufactured with lead, which product would you choose?"

Dkt. No. 68 ¶¶ 90–92. Perhaps unsurprisingly, based on the phrasing of these questions and the response options given, a large majority of respondents answered "important" or "very important" for the first question, "yes" for the second, and "the product not manufactured with lead" for the third. *Id.*

[15] The Securities Act does apply to omissions *only* of "material fact[s] necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading." RCW 21.20.010(2). But a higher standard applies to these:

> Washington courts define material fact as a fact to which a reasonable person would attach importance in determining their choice of action in the transaction in question. For an *omission* to be material, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.

*Freeman v. Seneca Ventures, LLC*, 16 Wn. App. 2d 1035, 2021 WL 423135, at *2 (Wash. Ct. App. Feb. 8, 2021) (citation modified) (emphasis added). As survey respondents were denied the "total mix of information" available to purchasers of Stanley tumblers, their decontextualized statements of preferences and importance do not show that information about Defendant's use of lead would have "significantly altered" this mix.

RCW 12.20. *See Freeman v. Seneca Ventures, LLC*, 16 Wn. App. 2d 1035, 2021 WL 423135, at *2 (Wash. Ct. App. Feb. 8, 2021); *Fed. Home Loan Bank of Seattle v. Credit Suisse Sec. (USA) LLC*, 194 Wn.2d 253, 272, 449 P.3d 1019, 1028 (2019); *FutureSelect Portfolio Mgmt., Inc. v. Tremont Grp. Holdings, Inc.*, 175 Wn. App. 840, 868 n.68 309 P.3d 555 (2013); *Stewart v. Est. of Steiner*, 122 Wn. App. 258, 265 n.9, 93 P.3d 919 (2004); *Aspelund v. Olerich*, 56 Wn. App. 477, 482, 784 P.2d 179 (1990); *Shermer v. Baker*, 2 Wn. App. 845, 855, 472 P.2d 589 (1970). Plaintiffs' preferred definition of materiality simply is not the law relevant to the CPA, nor to any of their other claims.

Next, the survey, which was conducted by Plaintiffs' counsel and relied on highly leading questions posed to respondents with extremely limited information, reveals at best that consumers told only that something is "manufactured with lead" would respond negatively in a vacuum, devoid of any other information or other factors to consider in the "total mix of information" as they make a purchasing choice. *See supra* n.15. In addition, contrary to Plaintiffs' allegation that their "survey results demonstrate that omissions of fact as to the presence and use of lead are material and reasonably likely to deceive reasonable consumers, such as Plaintiffs," especially in light of representations that "portrayed the Stanley tumblers as safe, meeting all applicable regulatory requirements and suitable for ordinary use" (Dkt. No. 68 ¶ 93), the survey questions actually have nothing to do with Defendant's marketing materials or their capacity to deceive consumers—just consumers' preferences.[16] [17] Ultimately, while the

---

[16] And, as explained *infra* Section III.C, Plaintiffs have not pleaded facts demonstrating either that Defendant marketed Stanley tumblers as "safe" or "meeting all applicable regulatory requirements" during the relevant period, or that Stanley tumblers are *not* "safe, meeting all applicable regulatory requirements and suitable for ordinary use."

[17] Plaintiffs cite *Outer Aisle Gourmet, LLC v. Bimbo Bakeries USA, Inc.*, No. C21-2599, 2022 WL 22893769, at *5 (C.D. Cal. Mar. 29, 2022) and *Intuit Inc. v. HRB Tax Grp., Inc.*, No. C24-253, 2024 WL 4093918, at *5 (N.D. Cal. Sept. 5, 2024) for the proposition that "[m]ateriality in false advertising claims is 'typically' proven through consumer surveys," (Dkt. No. 79 at 19) (quoting *Outer Aisle*, 2022 WL 22893769, at *5). But the Court is not so sure. *Outer Aisle* attributed this proposition to *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1140 (9th

survey results, if valid, might show some (unsurprising) preference for knowledge over ignorance and for non-lead over lead manufacture, they show nothing about consumers' *expectations* about the presence or absence of lead in Stanley tumblers, nor about how the *actual use of lead as it exists in Stanley cups specifically*—that is, under a steel cover on the tumbler's base—would be weighed against other decision-making factors and affect the behavior of reasonable consumers intending to buy Stanley tumblers.

The Court was clear that to show materiality, Plaintiffs needed to plead facts showing a specific and plausible risk posed by the lead included in Stanley tumblers. The ACCAC does not plead such facts, and Plaintiffs have not demonstrated that the Court should adopt a lower standard. Therefore, Plaintiffs have not remedied the CAC's deficiencies related to its showing that the use of lead in Stanley tumblers was material to a reasonable consumer.

**C.      Defendant's Alleged Affirmative Representations**

Plaintiffs state repeatedly that Defendant "represent[s]," "advertise[s]," or "market[s]" Stanley tumblers as "safe, durable, and suitable for ordinary use" (Dkt. No. 68 ¶¶ 13, 76, 82, 84, 141, 154, 171, 182, 208, 211, 220, 224, 226) or has "disclosed" or made "statements" to this effect (*id.* ¶¶ 100, 225). However, the ACCAC alleges few actual statements or representations made by Defendant before the publicization of the use of the lead sealing pellet in the base of the tumblers. Allegations of specific, affirmative representations made (presumably) during the relevant period are limited to statements that Stanley Tumblers are "Designed in Seattle" (Dkt.

---

Cir. 1997); *Intuit*'s authorities also ultimately lead back to *Southland Sod. See Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1110 (9th Cir. 2012) (cited by *Clorox Co. v. Reckitt Benckiser Grp. PLC*, 398 F. Supp. 3d 623, 644 (N.D. Cal. 2019)). But *Southland Sod* did not discuss the materiality element of the statute before it; it discussed the separate *deception* element, observing that surveys are "typically" used to test "[r]eactions of the public" to advertisements that, though "not literally false," are alleged to have "misled, confused, or deceived the consuming public." *Southland Sod*, 108 F.3d at 1140. While this has been often cited in the context of materiality (through no fault of Plaintiffs'), the Court is aware of no authority that has actually allowed materiality to be pleaded under the Rule 9(b) standard based only on a subjective self-report of consumers, as to whether they would consider a single, incomplete detail "important" in a transaction about which they have no other information.

ORDER ON MOTION TO DISMISS – 18

No. 68 ¶¶ 6, 36), that a product called the Stay Hot Camp Mug is "built to last, with solid 18/8 stainless steel construction," and that another product is "[y]our trusted companion whether you're hitting the road or your morning spin class" (Dkt. No. 68 ¶ 79). Assuming the representations seen by Plaintiffs Franzetti and Robinson were made by Defendant (which is not specifically pleaded), that adds "made from stainless steel, dishwasher safe, and easy to clean" (*id.* ¶ 25), along with "'durable,' 'stay hot 24H,' and 'rugged'" (*id.* ¶ 29). But while Plaintiffs plead that these representations were made, they plead no facts that any of these representations are untrue—and none of them are plainly contradicted by Defendant's use of lead.

The apparent factual basis for Plaintiffs' repeated assertion that Defendant explicitly markets Stanley tumblers as "safe" is an allegation that Defendant "represented that the Stanley tumblers 'meet all US regulatory requirements.'" *Id.* ¶ 80 (citing *Do Stanley Products Contain Lead?*, *supra*). Plaintiffs characterize this representation as "false and misleading for at least [three] reasons," all premised on the contention that Stanley tumblers do *not* comply with all applicable regulatory requirements (*id.* ¶ 81), and allege:

> Such representations would lead consumers to reasonably but mistakenly believe that PMI had disclosed all material components of the Stanley tumblers. Yet PMI failed to disclose that lead was integral to their products. PMI's labeling, marketing, and communications thus misled and deceived reasonable consumers by actively concealing and failing to disclose that the Stanley tumblers contained lead while at the same time representing them to be safe, durable, and suitable for ordinary use.

*Id.* ¶ 82. These allegations are perplexing. First, the quoted representation Plaintiffs point to is excerpted from Defendant's online statement titled "Do Stanley Tumblers Contain Lead?," in which Defendant acknowledges the presence of "some lead" in the sealing material of its

//

//

products. *Do Stanley Products Contain Lead?*, *supra*.[18] Lead is the primary "component" discussed, or "disclosed," in the statement, and no reasonable consumer presented with this representation would assume Stanley tumblers were lead-free. Second, and just as important, Defendant made all these representations after (indeed, directly in response to) public disclosure of the use of lead in Stanley Tumblers. Therefore, no Plaintiff or other class member could have relied on them for purchases made before January 4, 2024. *See* Dkt. No. 68 ¶ 109 (proposed class definition). In light of the timing and context of the statement, Plaintiffs' reasoning makes little sense.

Third, and finally, Plaintiffs have not pleaded any facts supporting the conclusion that Stanley tumblers are *not* in compliance with all applicable regulations. The only regulations or even "contaminant level goal[s]" referenced in the ACCAC apply to tap water and processed children's food—not Defendant's product. Significantly, even these *inapplicable* regulations were not implemented until October 2024 and January 2025, respectively, well after Plaintiffs' claims arose, and the statement about regulatory compliance was made. *See id.* 68 ¶¶ 2, 54–55. And, as explained *supra* Section III.B.1, Plaintiffs have not pleaded facts supporting the conclusion that Stanley tumblers pose a specific and plausible risk to consumers. If Stanley tumblers work as advertised and pose no plausible risk of harm, any representations by Defendant that the tumblers are "safe and suitable for ordinary use" cannot be shown to be "false" or "misleading."

//

//

//

---

[18] Plaintiffs also cite extensively to a later version of this statement. *Id.* ¶¶ 7, 18, 19, 58, 61, 62, 68 (citing *Do Stanley Products Contain Lead?* https://support.stanley1913.com/en/support/solutions/articles/69000850923-do-stanleyproducts-contain-lead, [https://perma.cc/V4GK-BUU6] (archived December 26, 2024)).

ORDER ON MOTION TO DISMISS – 20

**D.      Plaintiffs' Remaining Claims**

       **1.      Washington Consumer Protection Act**

Plaintiffs bring a claim under the CPA, RCW 19.86.010 *et seq.*, on behalf of the proposed class or, in the alternative, the proposed Washington subclass. *See* Dkt. No. 68 ¶¶ 118–132 (Claim I). To plead a claim under the CPA, a plaintiff must allege "(1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation." *Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 37, 204 P.3d 885 (2009) (citing *Hangman Ridge Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 784, 719 P.2d 531 (1986)); *accord Greenberg v. Amazon.com, Inc.*, 3 Wn.3d 434, 453, 553 P.3d 626 (2024). "A plaintiff need not show the act in question was intended to deceive, only that it had the capacity to deceive a substantial portion of the public." *Young v. Toyota Motor Sales USA*, 196 Wn.2d 310, 318, 472 P.3d 990 (2020) (quoting *Panag*, 166 Wn.2d at 47). "Deception exists if there is a representation, omission or practice that is likely to mislead a reasonable consumer." *Young*, 196 Wn.2d at 318 (quoting *Panag*, 166 Wn.2d at 50) (internal quotation marks omitted). "An accurate communication can still be deceptive." *Eng v. Specialized Loan Servicing*, 20 Wn. App. 2d 435, 446, 500 P.3d 171 (2021) (citing *Panag*, 166 Wn.2d at 50). Finally, whether an act is unfair or deceptive may be decided on a motion to dismiss. *See Greenberg*, 3 Wn.3d at 475 ("[T]he facts at the dismissal stage are not in dispute, which in turn permits an issue to be decided as a question of law.").

The Court dismissed this claim as pleaded in the CAC, because "Plaintiffs' allegations [were] insufficient to establish materiality under the WCPA or particularity of harm under Rule 9(b)." Because these deficiencies have not been cured, the Court must dismiss this claim for the reasons articulated *supra* Section III.B and in the Court's prior order (*see* Dkt. No. 66 at 9–10, 13).

Therefore, Defendant's motion is GRANTED as to Claim I (CPA), and the claim is DISMISSED.

### 2.    California Consumer Protection Statutes

Plaintiffs Krohn, Brown, and Robinson bring claims on behalf of themselves and the proposed California subclass for violations of two California statutes: the Unfair Competition Law ("UCL"), Cal. Bus. & Profs. Code §§ 17200 *et seq.* (*see* Dkt. No. 68 ¶¶ 133–145) (Claim II) and the Consumer Legal Remedies Act ("CLRA") Cal. Civ. Code §§ 1750 *et seq.*) (*see id.* ¶¶ 146–160) (Claim IV).

"The UCL prohibits, and provides civil remedies for, unfair competition, which it defines as 'any unlawful, unfair or fraudulent business act or practice.'" *Kwikset Corp. v. Superior Ct.*, 246 P.3d 877, 883 (Cal. 2011) (quoting Cal. Bus. & Prof. Code § 17200). Private suits under the UCL are "limited to any 'person who has suffered injury in fact and has lost money or property' as a result of unfair competition." *Id.* at 884 (quoting Cal. Bus. & Prof. Code § 17204). A UCL claim can be sustained under any of the three "prongs" of the UCL ("unlawful," "unfair," or "fraudulent"); Plaintiffs assert their claim under all three prongs. The Court reviews each prong in turn.

### a.    UCL Claim: "Unlawful" Prong

"A [UCL] action 'to redress an unlawful business practice "borrows" violations of other laws and treats [them] . . . as unlawful practices independently actionable.'" *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1214 (9th Cir. 2020) (quoting *Farmers Ins. Exch. v. Superior Ct.*, 826 P.2d 730, 734 (Cal. 1992)).

"'Unlawful' practices under the UCL encompass 'any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made.'" *Battle v.*

*Taylor James, LLC*, 607 F. Supp. 3d 1025, 1044 (C.D. Cal. 2022) (quoting *S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 85 Cal. Rptr. 2d 301, 311 (Cal. Ct. App. 1999)).

For the basis of this theory, Plaintiff pleads only that "PMI's failure to disclose the presence or use of lead in the Stanley tumblers violates the California's Consumers Legal Remedies Act [Cal. Civ. Code §§ 1750 *et seq.*]." Dkt. No. 68 ¶ 136 (brackets in original). Accordingly, this theory of liability relies on Plaintiffs' ability to plead facts supporting the conclusion that Defendant's omissions violated the CLRA. Because Plaintiffs do not do so, *see infra* Section III.E.C, they do not support a UCP claim premised on violation of the CLRA.

Therefore, the Court finds that Plaintiffs have not sufficiently alleged a UCL claim under the "unlawful" prong.

### b. UCL Claim: "Unfair" Prong

The Ninth Circuit has explained how to evaluate "unfair" practices under the UCL:

> [C]ourts consider either: (1) whether the challenged conduct is tethered to any underlying constitutional, statutory or regulatory provision, or that it threatens an incipient violation of an antitrust law, or violates the policy or spirit of an antitrust law [the "tethering" test]; (2) whether the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers [the "immoral" or "substantially injurious" test]; or (3) whether the practice's impact on the victim outweighs the reasons, justifications and motives of the alleged wrongdoer [the "balancing" test].

*Doe*, 982 F.3d at 1214–15 (internal citations and quotation marks omitted).

In the CAC, Plaintiffs attempted to plead a UCL violation under the "unfair" prong by applying the "immoral" and "balancing" tests to Defendant's omission of facts related to the use of lead in Stanley tumblers. The Court dismissed the claim, as alleged under this prong, because Plaintiffs "did not include sufficient facts to support a finding that the presence of lead in Stanley

cups in particular is harmful to consumers such that nondisclosure was 'substantially injurious' or fails the balancing test." Dkt. No. 66 at 22.

The ACCAC revives Plaintiffs' attempts to proceed on the immoral test and balancing tests, but these deficiencies are not cured. *See supra* Section III.B.1.

In addition, Plaintiffs cannot state a claim that relies on "balancing" the "impact on the victims" (here, the financial loss experienced by victims who were "cause[d] to purchase products they would not have if the true nature of the Stanley tumblers was disclosed or for which they would not have paid a premium price" (Dkt. No. 68 ¶ 137)) against the "reasons, justifications and motives of the alleged wrongdoer," without facts alleging what those "reasons, justifications, and motives" were.

The ACCAC also adds a theory of unfair business practices under the "tethering test," because Defendant's alleged labeling, marketing, and omissions "offend the policies of protecting consumers' health." *Id.* But the Court agrees with Defendant that this test is unhelpful, because the ACCAC lacks specific facts alleging that the tumblers (or any statements about them) pose a threat to consumer health.

Therefore, Plaintiffs have not cured the deficiencies previously identified by the Court regarding their UCL claim under the "unfair" prong, nor do they otherwise specifically plead an unfair business practice claim under the UCL. The Court accordingly finds that Plaintiffs have not sufficiently alleged a UCL claim under the "unlawful" prong.

       **c.**    **UCL Claim: "Fraudulent" Prong / CLRA Claim**

To allege a violation of the UCL's fraudulent prong, "a plaintiff must plead (1) misrepresentation or omission, (2) reliance, and (3) damages." *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1081 (N.D. Cal. 2022). The same elements are required for a fraud-based claim under the CLRA, which prohibits "unfair methods of competition and unfair or deceptive

acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770; *see Hammerling*, 615 F. Supp. 3d at 1081 (both statutes prohibit "prohibit fraudulent misrepresentations and omissions" and have the same elements for fraud-based claims). "Courts often evaluate these . . . claims together . . . ." *Hammerling*, 615 F. Supp. 3d at 1081.

Plaintiffs assert "fraudulent" businesses practices" under the UCL, including both false and misleading representations (Dkt. No. 68 ¶ 141) and omissions (*id.* ¶¶ 138–140, 142). Their CLRA claim is also based on fraudulent omissions (*id.* ¶¶ 152–155) and possibly also false or misleading representations (*id.* ¶ 152).[19] The Court considers each theory in turn.

### i. False and Misleading Representations

The UCL and CLRA "prohibit not only advertising which is false, but also advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public." *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (citation modified) (quoting *Kasky v. Nike, Inc.*, 45 P.3d 243, 250 (Cal. 2002)).

In dismissing the CAC, the Court held that Plaintiffs had not sufficiently alleged a fraudulent representation claim under the UCL, "because they did not allege that Plaintiffs were aware of any particular affirmative statements by Defendant." Dkt. No. 66 at 23. Without this allegation, Plaintiffs could not show they were injured by any of Defendant's representations.

---

[19] Paragraph 152 of the ACCAC includes a formulaic recitation of several specific "unfair or deceptive acts or practices" enumerated in the CLRA, most of which refer to "advertis[ements]" or "represent[ations]." However, Plaintiffs do not explain which facts support violations of these specific provisions, or how, and the CLRA claim otherwise appears based only on fraudulent omissions. Some of the CLRA provisions Plaintiffs list do not have an obvious relationship to the allegations in the ACCAC (for example, Cal. Civ. Code § 1770(a)(14)'s proscription on "representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law"), and it is unclear what Plaintiffs mean by invoking them. To the extent that Plaintiffs assert a CLRA claim based on false or misleading representations, the Court's "false or misleading representations" analysis for the UPL claim applies to the CLRA claim as well.

ORDER ON MOTION TO DISMISS – 25

In the ACCAC, Plaintiffs allege, in support of their UPL claim:

> 140. PMI marketed the Stanley tumblers as safe, in compliance with regulatory requirements, and suitable for ordinary use . . . .
>
> 141. PMI's advertisements also misleadingly suggested that Stanley tumblers were free of harmful materials, safe, durable, suitable for consumption, and in compliance with "all" applicable regulatory requirements. Class members, including Plaintiff Robinson, were aware of those statements.

Dkt. No. 68. As explained above, Plaintiffs have not alleged facts supporting the conclusion that Defendant ever suggested its products were "free of harmful materials." *See supra* Section III.C. The only statements Plaintiffs identify suggesting that Stanley tumblers were "safe," or "in compliance with 'all' applicable regulatory requirements" were made *after* Plaintiffs purchased Stanley tumblers, and class members could not possibly have been "aware of these statements" when making their purchases (and besides, Plaintiffs have not plausibly pleaded that these statements were false or misleading). *Id.*

On top of these deficiencies, the problem previously identified by the Court remains: Plaintiffs Krohn and Brown do not allege ever being aware of any representations by Defendant. Plaintiff Robinson pleads only that she "saw representations that the tumblers were 'durable,' 'stay hot 24H,' and [were] 'rugged.'" *Id.* ¶ 29. Even if these representations were made by Defendant and relied on by Plaintiff Robinson, however—neither of which she specifically pleads—her claim still fails because the ACCAC includes no specific facts supporting the conclusion that statements that Stanley tumblers are durable, are rugged, or can keep a beverage hot for 24 hours are false or misleading.

Therefore, the Court finds that Plaintiffs have not cured the deficiency it identified and do not sufficiently allege a UCL claim based on false or misleading statements under the "unlawful" prong.

ORDER ON MOTION TO DISMISS – 26

### ii.    Omissions

"Omissions may be the basis of claims under California consumer protection laws, but 'to be actionable the omission must be contrary to a representation actually made by the defendant, or *an omission of a fact the defendant was obligated to disclose.*'" *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 861 (9th Cir. 2018) (quoting *Daugherty v. Am. Honda Motor Co.*, 51 Cal. Rptr. 3d 118, 126 (Cal. Ct. App. 2006)).

Plaintiffs appear to assert their UPL claim based on both theories. For the first, they allege: "PMI marketed the Stanley tumblers as safe, in compliance with regulatory requirements, and suitable for ordinary use but failed to disclose the presence or use of lead in the design and manufacture of these products." Dkt. No. 68 ¶ 140. But again, according to the ACCAC, the only "representation[s] actually made" suggesting that Stanley tumblers were "safe," or "in compliance with 'all' applicable regulatory requirements" were made *after* Plaintiffs purchased Stanley tumblers, and could not have been relied on by Plaintiffs. *See supra* Section III.C. Moreover, Plaintiffs have not plausibly alleged that any of these representations (made or unmade) are contradicted by the omission in question (the particular use of a lead component in Stanley tumblers).

As the Court previously explained, the law concerning the duty to disclose for purposes of a fraudulent omissions claim has historically been "marked by general disarray," largely due to two distinct but similar tests for the existence of a duty. Dkt. No. 66 at 24 (quoting *Hammerling*, 615 F. Supp. 3d at 1085). However, the *Hammerling* court explained that in *Hodsdon*, 891 F.3d 857, the Ninth Circuit seems to have settled on one of the tests and, "post-*Hodsdon*, the Ninth Circuit and a majority of district courts have applied" the following factors:

> [A] defendant only has a duty to disclose when either (1) the defect at issue relates to an unreasonable safety hazard or (2) the defect is material, 'central to the product's function,' and the plaintiff

alleges one of the four *LiMandri* factors. [*In re Toyota*, 534 F. Supp. 3d] at 1102. The *LiMandri* factors are: (1) the defendant is in a fiduciary relationship with the plaintiff; (2) the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) the defendant actively conceals a material fact from the plaintiff; or (4) the defendant makes partial representations but also suppresses some material facts. *LiMandri v. Judkins*, . . . 60 Cal. Rptr. 2d 539[, 543] ([Cal. Ct. App.] 1997).

*Hammerling*, 615 F. Supp. 3d at 1085.

The alternative test allows a plaintiff a Plaintiff to plead the existence of a duty by plausibly alleging that (1) the defect relates to an unreasonable safety hazard, that (2) the defect is material and related to the product's central function; *or* (3) the presence of one of the four *LiMandri* factors. Dkt. No. 66 at 24 (citing *Hammerling*, 615 F. Supp. 3d at 1085).

For its UCL claim, Plaintiff appears to adopt this second test, asserting facts related only to two of the *LiMandri* factors:

> PMI was obligated to disclose the presence of lead in the Stanley tumblers because:
>
> a.     PMI had exclusive or superior knowledge of the presence or use of lead in the Stanley tumblers that was not known or reasonably accessible to Plaintiffs Krohn, Brown, and Robinson and the California Subclass; and
>
> b.     PMI actively concealed the presence or use of lead in the Stanley tumblers.

Dkt. No. 68 ¶ 139.

For its CLRA claim, Plaintiffs allege facts related to an additional *LiMandri* factor:

> c.     PMI marketed the Stanley tumblers as safe, durable, and suitable for ordinary use but failed to disclose the presence or use of lead, and having spoken on such issues PMI was obligated to disclose all material facts related thereto.

*Id.* ¶ 154. In its prior Order, the Court found that Plaintiffs had not sufficiently alleged a

fraudulent omission claim under the UCL "fraudulent prong," either of the tests described above, "because they do not allege materiality or an unreasonable safety hazard. However, these deficiencies may be cured by amendment." The Court "[a]ppl[ied] the same standard" in dismissing the CLRA claim.

But these deficiencies have not been cured by amendment. All the *LiMandri* factors relied on by Plaintiffs apply only to the omission of a *material* fact, which Plaintiffs have not plausibly pleaded. *See supra* Section III.B. As Plaintiffs have established neither "an unreasonable safety hazard" posed by the Stanley tumblers, nor the omission of "material" facts, Plaintiffs can only establish that Defendant had a duty to disclose the use of lead in the Stanley tumblers by plausibly pleading that such use is a "[material] defect . . . 'central to the product's function," or that Defendant and Plaintiffs are in a fiduciary relationship.

Plaintiffs do not assert that they shared a fiduciary relationship with Defendant. *See generally* Dkt. Nos. 68, 79. Plaintiffs argue in their response (although they did not plead) that "the seal of the vacuum insulation is . . . central to a product sold as insulated drinkware and that is what sets it apart from other drinkware." Dkt. No. 79 at 24. But the question is not whether the *seal* is central to the *tumbler*; the question is whether the alleged *defect* (that is, the presence of lead) is a material defect central to the tumbler's *function*—that is, its ability to hold and insulate beverages and be used as a drinking vessel. Plaintiffs pleaded no facts suggesting that lead-based solder impacts the utility of the sealing mechanism or other mechanical functions of Stanley tumblers. *See* generally Dkt. No. 68. To the extent that Plaintiffs allege that lead is a material defect because the Stanley tumblers cannot be used *safely*, this argument fails because Plaintiffs have not pleaded facts showing the presence of lead in Stanley tumblers poses a specific and plausible risk. *See supra* Section III.B.1.

Therefore, the Court finds that Plaintiffs have not cured the deficiencies it identified and do not sufficiently allege a CLRA claim, or a UCL claim under the "fraudulent" prong, based on fraudulent omissions.

Accordingly, the Court finds that Plaintiffs have not sufficiently alleged a UCL claim under the "fraudulent" prong.

\*    \*    \*

For the foregoing reasons, Plaintiffs have not cured the deficiencies identified by the Court as to their UCL and CLRA claims, and fail to plausibly state a claim for relief under the CLRA or any prong of the UCL. Therefore, Defendant's motion is GRANTED as to Claim II (UCL) and Claim IV (CLRA), and the claims are DISMISSED.

**3.    New York Consumer Protection Statutes**

Plaintiff Barbu brings claims for herself and the proposed New York subclass for violations of two New York statutes: (1) the Deceptive Acts and Practices Law, N.Y. Gen. Bus. Law § 349 (*see* Dkt. No. 68 ¶¶ 161–177) (Claim VI), and the False Advertising Law N.Y. Gen. Bus. Law § 350 (*see id.* ¶¶ 178–191) (Claim VII).

"GBL § 349 prohibits '[d]eceptive acts or practices in the conduct of any business, trade or commerce.'" *Montera v. Premier Nutrition Corp.*, 111 F.4th 1018, 1028 (9th Cir. 2024) (quoting N.Y. Gen. Bus. Law § 349). "GBL § 350 prohibits '[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service.'" *Id.* (quoting N.Y. Gen. Bus. Law § 350). "Section 350 specifically addresses false advertising but otherwise has the same broad scope and standard for recovery as § 349." *Id.* (citing *Karlin v. IVF Am., Inc.*, 712 N.E.2d 662, 665 (N.Y. 1999); *Goshen v. Mut. Life Ins. Co. of New York*, 774 N.E.2d 1190, 1195 n.1 (N.Y. 2002)). "To succeed on a claim under § 349 or § 350, the plaintiff must show that the defendant 'engaged in (1) consumer-oriented conduct that is (2) materially misleading and that

(3) plaintiff suffered injury as a result of the allegedly deceptive act or practice.'" *Id.* (quoting *Koch v. Acker, Merrall & Condit Co.*, 967 N.E.2d 675, 675 (N.Y. 2012)).

The Court previously dismissed both these claims because "Plaintiff Barbu does not allege that she was aware of any misleading statements prior to purchase, and Plaintiffs generally do not allege that the omission was material. However, these deficiencies could be cured by amendment." Dkt. No. 66 at 27.

These deficiencies have not been cured. The specific factual allegations related to Plaintiff Barbu do not indicate that she was ever aware of any representations by Defendant or anyone else related to Stanley tumblers, or ever read any Stanley tumbler labeling, before purchasing her first Stanley tumbler online in or around March 2022. *See* Dkt. No. 68 ¶ 26. The general and conclusory formulation that "Plaintiff Barbu and the New York Subclass members relied on the Stanley tumblers' labeling, marketing, [and] communications" does not meet the Rule 9(b) pleading standard. *Id.* ¶¶ 169, 185.

The Court assumes that Plaintiff Barbu does not assert a claim based on any tumblers she bought in or about March 2024, as this purchase was made after Defendant had publicly acknowledged the use of lead in Stanley tumblers, and after the purchase cut-off date for putative class members. *See* Dkt. No. 68 ¶¶ 17, 26, 109. The Court cannot ignore, however, that March 2024 is *after* Plaintiff Barbu filed her complaint in *Barbu v. Pacific Market International, LLC.*, No. C24-252, on February 24, 2024. Defendant correctly asserts that purchase "belies her assertion, on which her claims depend, that she would not have bought the cups had she known they contained lead." Dkt. No. 73 at 13. "Having bought a Stanley cup with the understanding that it contained lead, she is in no position to argue that the nondisclosure of lead in the cups was a material omission." *Id.* Remarkably, Plaintiffs do not address these arguments by Defendant or acknowledge the post-lawsuit purchase at all, which, as pleaded in the ACCAC, is fatal to all

Plaintiff Barbu's claims. *See generally* Dkt. No. 79. If Plaintiff Barbu purchased another Stanley tumbler shortly after learning about (and suing over) the presence of lead in the product, her allegations that she would not have made the purchases she made "[h]ad PMI disclosed" the presence of lead in Stanley tumblers (Dkt. No. 68 ¶ 26); that she "no longer uses the tumblers" due to the presence of lead (*id.*; *see also id.* ¶ 33); and that her earlier, unknowing purchase constitutes an "injury" (*id.* ¶ 33), simply are not plausible. "Plaintiff's own conduct [has] demonstrated that any . . . omissions were not material." *Rydman v. Champion Petfoods USA, Inc.*, No. C18-1578, 2023 WL 3506133, at *8 (W.D. Wash. May 17, 2023). It is hard to see how Plaintiff Barbu will be able to prevail on any of her claims in light of this fact; however, a further attempt at amendment may allow her to survive the pleading stage.

Therefore, Defendant's motion is GRANTED as to the Claims VI and VII (New York Statutes), and the claims are DISMISSED.

### 4.    Nevada Deceptive Trade Practices Act ("DTPA" or "NDTPA")

Plaintiff Franzetti brings a claim under the DTPA for herself and the Nevada subclass. *See* Dkt. No. 68 ¶¶ 192–202 (Claim VIII).

Under the DTPA, "a person engages in a 'deceptive trade practice' . . . in the course of his or her business or occupation" when, as relevant here, the person knowingly (1) "makes a false representation as to the source, sponsorship, approval or certification of goods or services for sale or lease," Nev. Rev. Stat. § 598.0915(2); (2) "[f]ails to disclose a material fact in connection with the sale or lease of goods or services," Nev. Rev. Stat. § 598.0923(1)(b); or (3) "[u]ses an unconscionable practice in a transaction" Nev. Rev. Stat. § 598.0923(1)(e). "To state a claim under the NDTPA, [a plaintiff] must allege '(1) an act of consumer fraud by the defendant (2) caused (3) damage to the plaintiff.'" *Motogolf.com, LLC, v. Top Shelf Golf, LLC,*

528 F. Supp. 3d 1168, 1178 (D. Nev. 2021) (quoting *Picus v. Wal-Mart Stores, Inc.*, 256 F.R.D. 651, 658 (D. Nev. 2009)).

In dismissing the CAC, the Court found that Plaintiff Franzetti had only asserted her claim under Section 598.0915(2) and other provisions dealing with affirmative misrepresentations. Dkt. No. 66 at 28. The claim failed because "Plaintiff Franzetti d[id] not allege awareness of any misrepresentations that would have caused her to purchase a Stanley cup in error [or even] that she viewed or was otherwise exposed to *any* representations by Defendant, at any point." *Id.*

In the ACCAC, Plaintiff Franzetti asserts both misrepresentation- and omission-based violations of the DTPA. As for affirmative misrepresentations, she alleges that before buying a Stanley tumbler around March 2023, she "saw materials describing its characteristics, including that it was made from stainless steel, dishwasher safe, and easy to clean." Dkt. No. 68 ¶ 25. Even if these representations were made by Defendant and relied upon by Plaintiff Franzetti, however—neither of which she specifically pleads—they cannot support a claim for a DTPA violation under Section 598.0915(2) because the ACCAC includes no specific facts supporting the conclusion that any of these were *mis*representions—that is, that they were false or deceptive. *See supra* Section III.B. As such, the deficiency has not been cured and the DTPA claim cannot proceed under Section 598.0915(2).

As for Plaintiff Franzetti's two new, omission-based theories of liability under the DTPA, these fail on account of the same deficiencies already brought to Plaintiffs' attention regarding other dismissed claims. Liability under Section 598.0923(1)(b) requires an omitted fact to be "material"—and the ACCAC does not establish materiality. *See supra* Section III.B; Dkt. No. 66 at 9–10, 13. Liability under Section 598.0923(1)(e) requires an "unconscionable practice," which

ORDER ON MOTION TO DISMISS – 33

the statute defines as

> an act or practice which, to the detriment of a consumer:
>
> (1) Takes advantage of the lack of knowledge, ability, experience or capacity of the consumer to a grossly unfair degree;
>
> (2) Results in a gross disparity between the value received and the consideration paid, in a transaction involving transfer of consideration; or
>
> (3) Arbitrarily or unfairly excludes the access of a consumer to a good or service.

Nev. Rev. Stat. § 598.0923(2)(b). The ACCAC does not specifically identified which "act or practice" is "unconscionable." Because Plaintiffs state in argument only that "NDTPA claims may proceed where, as here, a defendant suppresses or omits a material fact that it has a duty to disclose" (Dkt. No. 79 at 29 (citing *MST Mgmt., LLC v. Chicago Doughnut Franchise Co., LLC*, 584 F. Supp. 3d 923, 933 (2022))[20]), the Court can only assume that the practice in question is Defendant's omission of information about its use of lead from Stanley tumblers' labels and marketing. But because Plaintiffs have not shown that the lead in Stanley tumblers poses a risk to consumers, *see supra* Section III.B.1, or that its presence was otherwise a material fact, *see supra* Section III.B.2, Plaintiffs cannot show that withholding this information was "grossly unfair" or "grossly" impacted the value of the Stanley tumblers bought by unknowing consumers.[21] The

---

[20] Beyond alerting the Court to the conduct at issue in the NDTP claim, Plaintiffs' citation to *MST Management* is not helpful. The *MST* court, considering omissions-based claims brought under false-representations provisions of the DTPA, dismissed the claims as to defendants who allegedly made only material omissions because a material omission can be "equivalent to a false representation" only where a defendant has a duty to disclose, and the plaintiffs had made "no argument that the DTPA, other state law, or the contracts between the parties create[d] a duty" to disclose. *MST Mgmt.*, 584 F. Supp. 3d at 933 (quoting *Nelson v. Heer*, 163 P.3d 420, 426 (Nev. 2007)). This simply means that, without pleading an independent duty, Plaintiffs cannot rely on an omissions theory for their DTPA claim as bought under Section 598.0915(2). It means nothing at all about their DTPA claim to the extent it is brought under Section 598.0923, and is not correct as a statement of when DTPA claims "may proceed."

[21] As the ACCAC includes no allegations related to exclusion of access, the third prong of Section 598.0923(1)(e) does not appear to be at issue.

Court alerted Plaintiffs to its pleading deficiencies related to consumer risk and materiality in dismissing the CAC, but these deficiencies have not been cured.

Defendant also argues that any omission-based claim under the DTPA must be dismissed because, "under Nevada law, a 'straightforward vendor-vendee relationship[,] as a matter of law, creates no fraud-based duty to disclose.'" Dkt. No. 73 at 28 (quoting *Nev. Power Co. v. Monsanto Co.*, 891 F. Supp. 1406, 1417 (D. Nev. 1995)). The Court disagrees. As Plaintiffs point out, the case cited by Defendant (and a number of other cases identified by Plaintiffs) "discusses the vendor-vendee relationship with respect to a fraudulent concealment claim, not the NDTPA." Dkt. No. 79 at 30 (collecting cases). More to the point, the fact that a vendor-vendee relationship is not a "special relationship" that itself gives rise to a duty to disclose, *see Nev. Power Co. v. Monsanto Co.*, 891 F. Supp. at 1417, does not mean no duties can arise between a vendor and vendee. Here, the duty of disclosure arises from the DTPA itself, which makes it unlawful to knowingly "fail[] to disclose a material fact in connection with the sale or lease of goods or services" in the course of one's business or occupation. Nev. Rev. Stat. § 598.0923(1)(b). Defendant's unreasonable interpretation of *Nevada Power Co.* would make "vendors" immune to suits under this provision by their "vendees," an absurd result. In any case, as Defendant acknowledges (despite itself raising this issue) "[a]ctually, the parties are not even in a vendor-vendee relationship because Plaintiffs do not allege that they bought any products from Defendant." Dkt. No. 82 at 15 n.3. For all these reasons, Defendant's argument under *Nevada Power Co.* is unavailing. But Defendant's other arguments are sufficient to warrant dismissal of this claim.

Because Plaintiffs have not pleaded, with the specificity required under Rule 9(b), facts demonstrating any false representation, failure to disclose a material fact, unconscionable

practice, or other act of consumer fraud that caused them harm, they have not stated a claim for relief under the DTPA.

Therefore, Defendant's motion is GRANTED as to the Claim VIII (DTPA), and the claim is DISMISSED.

### 5.    Unjust Enrichment

Next, Plaintiffs bring a claim for unjust enrichment. *See* Dkt. No. 68 ¶¶ 203–213 (Claim X). The Court previously dismissed this claim, brought "under Washington law or the laws of Plaintiffs' respective states of residence for members of the respective State Subclasses" (Dkt. No. 48 ¶ 171), finding Plaintiffs had not stated a claim under Washington law nor explained how unjust enrichment claims in California, New York, or Nevada "are materially distinguishable from those recognized in Washington." Dkt. No. 66 at 30. This latter defect remains, and worse: Plaintiffs have not identified *any* state's law governing this claim. As Defendant rightly notes, the Court could dismiss the claim on this basis alone. Dkt. No. 73 at 29 (citing *Rodriguez v. Just Brands USA, Inc.*, No. C20-4829, 2021 WL 1985031, at *7 (C.D. Cal. May 18, 2021); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 781 F. Supp. 2d 955, 966 (N.D. Cal. 2011) (collecting cases)). Plaintiffs, ignoring Defendant's authority and citing cases relevant to conflicts of law, suggests that this omission is "irrelevant" because" "the governing state law can be addressed later in the litigation." Dkt. No. 79 at 31. Plaintiffs are mistaken. While governing law can certainly be contested past the pleading stage, a claim cannot be stated that arises from *no* identified body of law at all. Defendant has a right to defend itself, and it cannot effectively answer for an alleged violation of an unidentified law. Therefore, the claim must at the very least be amended. For the purposes of considering whether the claim can otherwise survive, the Court will apply Washington common law, as the Parties do. *See* Dkt. No. 73 at 29; Dkt. No. 79 at 30.

Unjust enrichment "occurs when one retains money or benefits which in justice and equity belong to another." *Bailie Commc'ns, Ltd. v. Trend Bus. Sys., Inc.*, 61 Wn. App. 151, 160, 810 P.2d 12 (1991). This cause of action "is the method of recovery for the value of the benefit retained absent any contractual relationship because notions of fairness and justice require it." *Young v. Young*, 164 Wn.2d 477, 484, 191 P.3d 1258 (2008) (citing *Bailie Commc'ns*, 61 Wn. App. at 160). To state a claim for unjust enrichment, Plaintiff must show: "[1] a benefit conferred upon the defendant by the plaintiff; [2] an appreciation or knowledge by the defendant of the benefit; and [3] the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *Young*, 164 Wn.2d at 484 (quoting *Bailie Commc'ns*, 61 Wn. App. at 159–60).

For the same reasons it dismissed Plaintiffs' CPA, products liability, and warranty claims, the Court previously found that Plaintiffs had not sufficiently pleaded a claim for unjust enrichment under Washington law, because they did "not allege 'circumstances as to make it inequitable' for Defendant to retain any alleged benefit." Dkt. No. 66 at 29. Defendant now urges that "[b]ecause the Amended Complaint adds nothing to the Complaint, the same result is warranted with respect to this claim in the Amended Complaint." Dkt. No. 73 at 29. "[B]ecause 'Plaintiffs have failed to plead an actionable omission or misrepresentation,'" their "unjust enrichment claim has no support." *Id.* (quoting *Balistreri v. McCormick & Co.*, No. C25-349, 2023 WL 5988600, at *13–14 (N.D. Cal. Sept. 13, 2023)). The Court agrees.

Because Plaintiffs have not pleaded the essential element of materiality with the specificity required under Rule 9(b), *see supra* Section III.B, and because they do not identify under which state's law this claim arises, the claim is DISMISSED.

Therefore, Defendant's motion is GRANTED as to the Claim X (unjust enrichment), and the claim is DISMISSED.

**6.      Fraudulent Omission**

Finally, Plaintiffs bring a claim for fraudulent omission under on behalf of the putative nationwide class. *See* Dkt. No. 68 ¶¶ 214–229 (Claim XI).

In the CAC, Plaintiffs alleged the tort of fraudulent omission under Washington common law. "To establish fraud under Washington law, '[t]he plaintiff may affirmatively plead and prove the nine elements of fraud or may simply show that the defendant breached an affirmative duty to disclose a material fact.'" *Zwicker v. Gen. Motors Corp.*, No. C07-291, 2007 WL 5309204, at *4 (W.D. Wash. July 26, 2007) (quoting *Crisman v. Crisman*, 85 Wn. App. 15, 21, 931 P.2d 163 (1997)). A fraudulent omission claim proceeds via the latter route. "When a duty to disclose does exist . . . the suppression of a material fact is tantamount to an affirmative misrepresentation." *Wurts v. City of Lakewood*, No. C14-5113, 2015 WL 1954663, at *11 (W.D. Wash. Apr. 29, 2015) (citing *Wash. Mut. Sav. Bank v. Hedreen*, 125 Wn.2d 521, 526, 886 P.2d 1121 (1994)).

In the ACCAC, however, as with their other tort claims, Plaintiffs have not identified which state's law governs this claim. Again, the Court could dismiss the claim on this ground alone. On the reasonable assumption that the claim is asserted under the common law of one of the proposed subclasses, however, Respondent points out that "it makes no difference because materiality is an essential element of a fraudulent omission claim under New York, California, and Nevada law as well" as Washington law. Dkt. No. 73 at 29 (citing *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1108 (N.Y. 2011) (fraudulent omission claim under New York law requires materiality); *Prakashpalan v. Engstrom, Lipscomb & Lack*, 167 Cal. Rptr. 3d 832, 853 (Cal. Ct. App. 2014) (same under California law); *Leigh-Pink v. Rio Props.*, LLC, 512 P.3d 322, 325–26 (Nev. 2022) (same under Nevada law)).

In dismissing Plaintiffs' fraudulent omission claim as pleaded in the CAC, the Court found that "Plaintiffs have not sufficiently pleaded a claim for fraudulent omission because they do not sufficiently allege the presence of lead in the Stanley cups was a material fact that should have been disclosed. However, these deficiencies may be cured by amendment." These deficiencies have not been cured, as explained *supra* Section III.B. Because Plaintiffs have not pleaded the essential element of materiality with the specificity required under Rule 9(b), and because they do not identify under which state's law this claim arises, the claim is DISMISSED.

Therefore, Defendant's motion is GRANTED as to the Claim XI (fraudulent omission), and the claim is DISMISSED.

**E.    Leave to Amend**

Defendant requests that the Court dismiss the claims against them without leave to amend because Plaintiffs have "submitted a pleading that suffers from exactly the same defects as its predecessor[, and t]here is no reason to think yet another try would produce a different outcome." Dkt. No. 73 at 31. Plaintiffs request that, "[i]f the Court grants PMI's Motion to Dismiss for reasons beyond those in its Order, . . . it should grant Plaintiffs leave to amend to address those concerns." Dkt. No. 79 at 32.

"Normally, when a viable case may be pled, a district court should freely grant leave to amend." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1058 (9th Cir. 2011) (citing *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1039 (9th Cir. 2002)). However, "a party is not entitled to an opportunity to amend his complaint if any potential amendment would be futile." *Mirmehdi v. United States*, 689 F.3d 975, 985 (9th Cir. 2012).

Plaintiffs have submitted two consolidated pleadings in this case. Dkt. Nos. 48, 68. By and large, the Court dismisses the second pleading on the same grounds as the first. Although some deficiencies have been partially remedied, *see supra* Section III.B.1, none has been

completely cured, and new deficiencies are also apparent in the ACCAC. Although the Court recognizes that Plaintiffs have several opportunities to plead viable claims against Defendant, the deficiencies remain of the type that might be cured by amendment. In the Ninth Circuit, denial of leave to amend may be considered after a party's "*repeated* failure to cure deficiencies by amendments previously allowed." *Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 574 (9th Cir. 2020) (emphasis added).

In short, although Plaintiffs' pleadings are inadequate here, they are not so deficient as to render them lost causes. *See United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1184 (9th Cir. 2016) (finding district court abused its discretion when denying leave to amend, because plaintiff "might be able" to satisfy Rule 9(b) "through further amendment," and because the complaint had "allege[d] a cognizable legal theory" which indicated that "amendment would not be futile"); *see also de Lozano v. Nissan N. Am., Inc.*, No. C22-1887, 2023 WL 3432240, at *3 (C.D. Cal. Apr. 20, 2023) ("Plaintiff's Rule 9(b) pleading defects may likely be cured on amendment, thus Rule 9(b) does not render further amendment futile."). Because the Court cannot yet conclude that further amendment would be futile, dismissal without leave to amend would be inappropriate here. However, if Plaintiffs again fail to cure the deficiencies of their claims, particularly as related to materiality, leave to amend will not be granted again.

## IV.   CONCLUSION

Accordingly, Defendant Pacific Market International, LLC's Motion to Dismiss (Dkt. No. 73) is GRANTED. Is it hereby ORDERED:

(1)   The ACCAC (Dkt. No. 68) is DISMISSED in its entirety. All causes of action therein are DISMISSED with leave to amend.

(2)   Should Plaintiffs choose to file a Second Amended Consolidated Class Action Complaint, they SHALL do so within **forty-five (45) days** of this Order.

Defendant SHALL respond to any amended pleading within **thirty (30) days** of its filing.

(3)     Defendant's pending Motion to Strike the Amended Complaint's Nationwide Class Allegations (Dkt. No. 74) is STRICKEN as moot.

Dated this 3rd day of April, 2026.

_____

Tana Lin
United States District Judge

ORDER ON MOTION TO DISMISS – 41